621 So.2d 1141 (1993)
John E. JORDAN,
v.
INTERCONTINENTAL BULKTANK CORPORATION.
No. CA 90 2146.
Court of Appeal of Louisiana, First Circuit.
February 19, 1993.
Rehearing Denied April 28, 1993.
Writs Denied September 17, 1993.
*1145 Terry A. Bell, Atty., Belle Chasse, Patrick W. Pendley, Atty., Plaquemine, John M. Deakle, Atty., Hattiesburg, MS, for plaintiffs-appellees John E. Jordan and Emo Jean Jordan.
Patrick O'Keefe, Atty., Clayton G. Ramsey, Atty., Ira J. Rosenzweig, Atty., New Orleans, H. Alston Johnson, III, Atty., Baton Rouge, for defendant-appellant Intercontinental Bulktank Corp.
Before SHORTESS, CARTER, CRAIN, GONZALES and CHIASSON, JJ.
CRAIN, Judge.
This action is a suit in admiralty to recover compensatory and punitive damages and maintenance and cure for an injury sustained by the plaintiff seaman on board the defendant's vessel. The trial judge granted plaintiff's motion for a directed verdict on the issues of maintenance and cure. The trial jury found for the plaintiff on his Jones Act (46 U.S.C.App. § 688) and general maritime tort claims and awarded plaintiff $650,000.00 in compensatory damages. The jury also awarded $1,000,000.00 in punitive damages for arbitrary and capricious failure to pay maintenance and cure. The trial court rendered judgment according to the directed verdict and the jury's verdict. The defendant took this suspensive appeal.

FACTS
Plaintiff, John Jordan, was employed by defendant, Intercontinental Bulktank Corporation (IBC), as chief pumpman on the S/S Overseas Alaska. On June 2, 1988, Jordan was ordered by the chief engineer and chief mate of the vessel to construct a support bracket for an air conditioning unit. Jordan needed an acetylene torch to do the work and went down to the engine room to get an acetylene bottle. Jordan claimed John Wayne Labure, first assistant to the chief engineer, told him to put the bottle on his shoulder and carry it up on deck. Although Labure denied giving this order, he testified this was the way these bottles were usually moved. Labure testified that the ship was "fully crewed" at the time and Jordan could have gotten help had he asked for it.
Robert Borison, a safety consultant, testified the acetylene bottle weighed approximately 79 pounds and contained a highly flammable gas. After inspecting the ship, Borison testified as follows:
Q How do you understand that the acetylene bottle was being transported at the time of Mr. Jordan's injury?
A I understand he was instructed to lift it up, place it on his shoulder and carry it.
Q Is that a proper way of moving an acetylene bottle, in your opinion?
A No, sir.
Q What are the hazards of moving acetylene in that manner?
A Aside from the physical injuries sustained, or could be sustained by the person carrying it, I think the overall danger to the vessel and/or the people involved in working in that vessel overshadows any personal danger to an individual. For example, if that man would have fallen and dropped the bottle it may have exploded thereby damaging the ship, sinking the ship at sea. It could have injured no telling how many people on that vessel, particularly where he was carrying it. He was asked to carry it up a flight of stairs, across an elevated walkway overlooking *1146 the engine compartment, approximately twenty feet above the top of the engine compartment and then up a very large and steep sixty percent grade stairway. All of these combined, in my opinion, placed the defendant and the vessel in extreme danger. It's very fortunate he didn't drop the bottle.
Jordan, who was 53 years old and weighed approximately 120 pounds, lifted the 79-pound bottle, placed it on his shoulder, climbed three flights of stairs, and walked through a watertight door onto the main deck of the vessel. As he bent over to put the acetylene bottle down, he felt pain in his lower back. Jordan was unable to keep working. He went to his room and remained there until the ship docked two days later. Jordan went ashore and was examined at the St. James Parish Hospital and released. After spending the night in a motel, Jordan returned to the ship to collect his wages and caught a flight to his home in Mobile, Alabama.
Jordan was seen by Dr. Michael Ledet in Mobile on June 13, 1988. He complained of severe lower back pain that radiated down his left leg. Dr. Ledet referred Jordan to Dr. Norman Lichtenfeld who admitted him to Providence Hospital on June 15, 1988. Dr. Lichtenfeld diagnosed minimal bulging of the L4-5 disc and narrowing of the L5-S1 disc space. He found no evidence of disc herniation. Following traction and physical therapy, Jordan was released from the hospital on June 25, 1988.
On July 21, 1988, Jordan consulted Dr. Kenneth Vogel, a neurosurgeon, in New Orleans, Louisiana. A CAT scan showed disc herniation with bilateral stenosis at the L5-S1 level. Dr. Vogel performed a microsurgical laminectomy on Jordan on August 29, 1988, at Mercy Hospital. Dr. Vogel determined that Jordan would not reach maximum medical improvement until one year after surgery and concluded Jordan would have a 10 to 15 percent medical impairment of the body as a whole. Dr. Vogel also advised Jordan to avoid lifting, pushing, or pulling weights greater than 50 pounds on a permanent basis. Dr. Vogel last saw Jordan on December 13, 1988.
Jordan's pain continued after the surgery. He consulted Dr. John Watermeier, an orthopaedic surgeon, on March 14, 1989. Dr. Watermeier diagnosed Jordan as having lumbar disc syndrome. After numerous visits, Dr. Watermeier recommended that Jordan undergo a CAT scan and an MRI to determine the exact cause of the pain. Dr. Watermeier testified that if Jordan needed additional surgery it would cost between $15,000.00 and $20,000.00. As of the time of trial (June 15, 1990), Jordan had not undergone these tests because he did not have the money to pay for them. Dr. Watermeier last saw Jordan on November 22, 1989, and testified at that time Jordan's condition had not improved. Dr. Watermeier agreed with Dr. Vogel's assessment that Jordan should avoid lifting, pushing or pulling weight greater than 50 pounds and suffered a 10 to 15 percent disability of the body as a whole.
IBC had Jordan examined by Dr. Randall Lea in Baton Rouge, Louisiana, on February 6, 1990. Dr. Lea, an orthopaedic surgeon, concluded that Jordan suffers from "failed back syndrome" which he explained as continued pain after surgery. This pain, he indicated, could be caused by further disc herniation that might require additional surgery. Dr. Lea testified that if Jordan underwent additional surgery, he would not reach "maximum medical cure" until one year after surgery. Dr. Lea recommended that Jordan undergo an MRI to determine the cause of his pain. Dr. Lea stated that Jordan would not be able to return to his old job and should be relegated to sedentary or light work, regardless of whether further surgery was required.
Donald Wooddall, an expert in vocational rehabilitation and training, testified Jordan's age, education, and medical condition would make it very difficult for Jordan to find employment of a sedentary nature. However, Nancy Favaloro, IBC's expert in vocational rehabilitation, disagreed with this assessment and testified there were job opportunities available for Jordan.
*1147 Jordan testified he continues to experience pain in his lower back and is unable to work. Prolonged standing or sitting causes the pain to intensify. Jordan maintains he can no longer hunt and fish and is relegated to watching television in his rented trailer.[1] Jordan claims that he has delayed getting medical treatment, medication, and the additional testing recommended by Drs. Watermeier and Lea because he does not have any money. Jordan testified the maintenance and cure he received from IBC was not enough to cover his medical expenses or his living expenses. Jordan has been forced to borrow money for food and rent. He claims that IBC has delayed maintenance payments for periods of from 3 to 6 months.
Terry Bell, one of Jordan's attorneys, testified that he sent a November 20, 1989, letter to IBC's attorneys demanding maintenance and cure. The trial court, over IBC's objection, admitted this letter into evidence. The letter provides, in pertinent part, as follows:
As I promised last week, you will find enclosed a revised medical tabulation showing amounts paid by myself, my co-counsel, and the Welfare Plan. This tabulation also shows the total amount of medical expenses incurred by Mr. Jordan. On the second page is a recapitulation showing amounts still owed to various providers as well as the amounts paid by the Welfare Plan. Some of these accounts, particularly that of Providence Hospital, are quite old.
Despite the provisions of the contract that the Welfare Plan is obligated to pay medical expenses, as you are aware, that does not obviate the requirement that the employer pay cure. I have attached supporting documentation to the Tabulation and suggest that all amounts be paid within three weeks of the date of this letter. Otherwise, I believe we will have a good claim for punitive damages in this case which would be tried to a receptive judge.
Finally, the medical which was given to you last week, particularly that from Dr. Watermeier, indicate that Mr. Jordan has not reached maximum medical cure as of this date. Accordingly, maintenance should have been paid through the present date. I would appreciate it if you would rectify this situation.
The attachments to the letter show that as of November 20, 1989, Jordan had $6,132.70.00 in unpaid medical bills.[2] Some of the unpaid bills were over a year old. Bell also wrote to IBC's attorneys on March 15, 1990, and again asked that maintenance and cure payments be made. This letter was admitted into evidence over IBC's objection, but it is not in the record on appeal.
At the close of the evidence, the trial judge granted Jordan's motion for a directed verdict on the issue of whether IBC owed Jordan maintenance and cure. The trial judge held IBC owed $2,529.20 in unpaid cure. The trial judge awarded maintenance due between June 2, 1988, and June 16, 1990, totaling $12,665.00 subject to a credit in favor of IBC in the amount of $4,144.00 for amounts already paid. Maintenance was calculated at $17.00 a day despite the fact that the collective bargaining agreement between Jordan's union and IBC called for maintenance payments at $8.00 a day.
The jury held as follows: S/S Overseas Alaska was "unseaworthy" on June 2, 1988; IBC was negligent, and that negligence was a cause of Jordan's injury; and Jordan was not negligent. The jury awarded $650,000.00 in compensatory damages itemized as follows:

TOTAL WAGE LOSS $250,000.00
MENTAL ANGUISH $125,000.00
PAST AND FUTURE
PAIN AND SUFFERING $150,000.00
PAST AND FUTURE MENTAL
PAIN AND SUFFERING $125,000.00

The jury also found IBC arbitrary and capricious in failing to timely pay maintenance *1148 and cure to Jordan and awarded $1,000,000.00 in punitive damages against IBC. IBC was ordered to pay interest on the awards for compensatory and punitive damages from the date of judicial demand, July 7, 1988. IBC's motion for a new trial was denied. IBC then took this suspensive appeal.

JORDAN'S ATTORNEY AS A WITNESS

(Assignment of error 1a)
IBC contends the trial court erred by allowing one of Jordan's attorneys, Terry Bell, to testify at trial.
To prove that numerous attempts were made to collect maintenance (living expenses) and cure (medical expenses) from IBC, Jordan called IBC's designated corporate representative, John Wayne Labure, as a witness. Labure's testimony showed he was not an officer of IBC, had never visited IBC's headquarters in New York City, knew nothing about the handling of this case, knew nothing about IBC's procedures for handling maintenance and cure claims, and did not know why he had been designated IBC's corporate representative. Jordan then attempted to call one of IBC's attorneys, Ira Rosenzweig, as a witness, and IBC objected. The trial judge sustained IBC's objection to Rosenzweig being called as a witness. Jordan, over IBC's objection, then called Terry Bell, one of his attorneys, as a witness. In overruling IBC's objection, the trial judge reasoned as follows:
THE COURT:and I'm notI'm going to tell you right now, I'm not going to prevent him from putting those letters in evidence. If you don't want the man to testify, stipulate that the letters were sent or got to you or received or whatever. If you don't, I'm going to let him testify.
MR. O'KEEFE: Your Honor, I
THE COURT: You haveyou have a witness over here who's a corporate representative, who knows nothing about it and I think he has a right to put these letters in evidence. I'm listening. I know what this case is about. I've been here for I don't know, a year and a half, two years on this case since it started and he's got a right to get those letters into evidence and I think the easiest way without having the problem is to stipulate. If you don't want to do that, I'm going to let him testify; very simple.
The court also overruled IBC's motion for a mistrial and a motion to have Bell disqualified from representing Jordan.
In support of its assignment of error, IBC cites Rule 3.7 of the Louisiana Supreme Court Rules of Professional Conduct which provides as follows:
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) The testimony relates to an uncontested issue;
(2) The testimony relates to the nature and value of legal services rendered in the case; or
(3) Disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.
(c) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.
(Emphasis added.)
This rule prohibits attorneys from acting as advocates in trials in which they are likely to be called as witnesses. It does not prohibit attorneys from testifying at a trial about facts essential to the case. Article 601 of the Louisiana Code of Evidence provides as follows: "Every person of proper understanding is competent to be a witness except as otherwise provided by legislation." There is nothing in the Rules of Professional Conduct or The Louisiana *1149 Code of Evidence providing that an attorney is not a competent witness in a trial in which he represents a party to the litigation. Bell was properly permitted to testify.[3]
This assignment of error is without merit.

JUROR MISCONDUCT

(Assignment of error 1c)
IBC asserts the trial court erred in not sustaining its motion for a mistrial based on an alleged conversation between one or more of the jurors and Jordan in violation of the judge's pre-trial instructions to the jurors.
On the morning of the second day of trial, defense counsel observed Jordan talking to one or more of the jurors outside the courthouse and informed the court. In denying IBC's motion for a mistrial, the trial judge reasoned as follows:
THE COURT: ...
Igetting the facts straight for the recordwas informed that there was some conversation outside the courthouse this morning or downstairs prior to the courthouse being open. There were three or four jurors out there and the plaintiff and I think the plaintiff's son, if that's who he is, was outside the courthouse. There was some conversation.
And it was reported to me.
I went to the jury in the jury room and asked them what was the confrontation outside the courthouse.
And one juror said he had asked Mr. Jordan if the young man was his son. And he said it was. There were a very few words crossed between them.
And I asked him if this would have any affecto[n] any of the jurorsif this would have any [e]ffect on their judgment in the case. And the word was "no". And I think that was sufficient.
And I will admonish the jury and I will see about any contempt after this case is over with as far as either to the jurors or the plaintiff in this case, but as far as a mistrial is concerned I think that's a bit too harsh a remedy for the situation that occurred. I feel that there is no harm done to either side in the case.
Motion is not granted.
The law applicable to mistrials in civil jury trials is set forth in Barnes v. Thames, 578 So.2d 1155, 1161 (La.App. 1st Cir.), writ denied, 577 So.2d 1009 (La.1991), as follows:
The Louisiana Code of Civil Procedure does not expressly provide for mistrials, and the jurisprudence concerning motions for mistrial in civil cases is limited. Generally, mistrials are properly granted because of some fundamental failure in the proceeding.... Generally, a motion for mistrial in a civil case should be granted under the following circumstances: (1) when, before the trial ends and the judgment is rendered, the trial judge determines that it is impossible to reach a proper judgment because of some error or irregularity; and (2) where no other remedy would provide relief to the moving party....
Motions for mistrial should also be granted upon proof of prejudicial misconduct occurring during a jury trial, which cannot be cured by admonition or instruction.... Because a mistrial results in the discharge of one jury and the impaneling of another to try the case anew, it is a drastic remedy.... The trial judge is vested with broad discretion to grant a motion for mistrial where no other remedy would afford relief or where circumstances indicate that justice may not be done if the trial continues.... This court should not disturb the trial court's determination unless there was an abuse of discretion.
(Citations omitted.) A prerequisite for a successful motion for a mistrial in a civil jury case is that "the trial judge determines *1150 that it is impossible to reach a proper judgment because of some error or irregularity." (Emphasis added.) Usner v. Strobach, 591 So.2d 713 (La.App. 1st Cir. 1991), writ denied, 592 So.2d 1289 (La. 1992).
The mere violation of a sequestration order does not compel that a mistrial be declared. Although misconduct of jurors may be a cause for granting a mistrial, the misconduct must be such that it is impossible to proceed to a proper judgment. Contact or communication between a juror and a party or counsel during the trial of a civil action may be a sufficient ground for the declaration of a mistrial where it appears that the act or occurrence in question is potentially, or may have been actually, prejudicial to the complaining party. Searle v. Travelers Insurance Co., 557 So.2d 321 (La.App. 4th Cir.1990). See also Peters v. Atlanta International Insurance Co., 469 So.2d 421 (La.App. 3rd Cir.), writ denied, 474 So.2d 949 (La. 1985); Kollet v. Baggot, 400 So.2d 1085 (La.App. 1st Cir.1981).
This court in Kollet v. Baggot, 400 So.2d at 1086, stated the following in affirming the trial court's denials of motions for mistrial and new trial based on improper communication between a litigant and a juror:
It is evident from the record that the persons involved hardly knew each other, that they were never alone during their conversations, and that the two men were able, separately, to confirm each other's recollections of the content of the conversations. From the record, this court is unable to find anything in those conversations other than ordinary pleasantries.

The record shows that the trial judge found no misconduct on the part of any juror or any party such as to constitute proof that the jury behaved improperly so that impartial justice was not done.
(Emphasis added.) Given the nature and brevity of the conversation between Jordan and the juror(s), IBC has failed to show that it was "impossible to reach a proper judgment" in this case. The trial court did not abuse its discretion in refusing to grant IBC's motion for a mistrial.
This assignment of error is without merit.

FAILURE TO CONTROL PROCEEDINGS

(Assignment of error 1d)
IBC claims the trial court erred by failing to properly control the proceedings. In addition to the issues discussed in the two previous assignments of error, IBC asserts failure to control the proceedings is evidenced by the:
failing to sustain defense counsel's repeated objections to questions on letters not in evidence and use of such letters for cross-examination ...;
failing to correct the jury's misimpression regarding the court's ruling on maintenance and cure;
permitting Jordan's counsel, over objection, to distribute and discuss the verdict form, a prerogative customarily reserved to the court.
(Footnote omitted.)
IBC also contends the trial court failed to confine closing arguments within proper bounds. Specifically, IBC claims the trial court erred in allowing Jordan's counsel to make reference to letters and a punitive damage award against the defendant in another case when these facts were not in evidence.
Louisiana Code of Civil Procedure article 1631 provides as follows:
A. The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.

B. The exclusion of witnesses is governed by Louisiana Code of Evidence Article 615.
(Emphasis added.)
The trial judge is vested with broad discretion in conducting trials in a manner which he determines will be conducive to *1151 justice. First National Bank v. Carr, 572 So.2d 1106 (La.App. 1st Cir.1990).
The record shows that IBC's counsel made only one objection during Jordan's closing statement. This objection was made after Jordan's counsel referred to letters not in evidence. The trial judge sustained the objection. The trial judge instructed the jury both before and after closing arguments that arguments of counsel are not evidence. IBC made no objection to statements by Jordan's counsel regarding the punitive damage award in the other case. Failure to make a timely objection to opposing counsel's closing remarks constitutes waiver of the right to complain on appeal. Ogletree v. Willis-Knighton Memorial Hospital, 530 So.2d 1175 (La. App. 2d Cir.), writ denied, 532 So.2d 133 (La.1988); Brumfield v. Brumfield, 477 So.2d 1161 (La.App. 1st Cir.), writ denied, 479 So.2d 922 (La.1985).
This assignment of error is without merit.

REFUSAL TO LET EXPERT TESTIFY

(Assignment of error 2)
IBC asserts the trial court erred by excluding the testimony of its expert economist, Dan Cliffe.
IBC had planned to call Dr. Kenneth Boudreaux to testify as an expert economist and listed him as a witness in answers to Jordan's interrogatories. Just before trial, Dr. Boudreaux was called out of the country on business. IBC sought to substitute Dan Cliffe as its expert economist. He was not listed in answers to Jordan's interrogatories. IBC contended Cliffe assisted in preparing the reports from which Dr. Boudreaux was to testify and Jordan would not be prejudiced by Cliffe's testimony. Jordan's attorneys claimed Cliffe should not be allowed to give his opinion as to Dr. Boudreaux's reports. They also objected on the ground that they were not familiar with Cliffe's qualifications; however, one of Jordan's attorneys admitted he had taken Cliffe's testimony in another case. The trial court granted Jordan's motion in limine to exclude Cliffe's testimony.
The reports[4] contain the following sentence: "Please note that this report is produced jointly by Professors James T. Murphy, J. Stewart Wood, Dan M. Cliffe and myself any of whom may testify at trial." These reports were proffered when the trial court refused to allow Cliffe to testify.[5]
La.C.C.P. art. 1428 provides as follows:
A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.
(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which he knows that the response was incorrect when made, or he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.
The trial judge has the discretionary power to allow or disallow the testimony of a witness at trial when a party has failed to satisfy a duty to supplement answers to *1152 interrogatories. Murray v. Sapp, 573 So.2d 495 (La.App. 1st Cir.1990).
The trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the grounds of failure to abide by the statutory mandate, but any doubt must be resolved in favor of receiving the testimony. When a party has not satisfied the technicality of supplementing responses to interrogatories, the reviewing court can look to the record for a willful or negligent failure to disclose names of witnesses in determining whether the trial judge abused his discretion. Abdon Callais Boat Rentals v. Louisiana Power and Light Co., 555 So.2d 568 (La.App. 1st Cir.1989), writ denied, 558 So.2d 583 (La.1990). The power to disallow the testimony should be exercised only when the ends of justice dictate the exclusion of the testimony. Bush v. Winn Dixie of Louisiana, 573 So.2d 508 (La.App. 4th Cir.1990), writ denied, 578 So.2d 930 (La. 1991).
The following factors are pertinent in determining whether the trial court abused its discretion: (1) the reason IBC did not list Cliffe in its answers to interrogatories was because it thought Dr. Boudreaux would be available to testify; (2) Cliffe's testimony would have been based on the same reports as Boudreaux's; (3) one of Jordan's counsel was familiar with Cliffe's qualifications; and (4) IBC was highly prejudiced by not having an economist to counter the testimony of Jordan's economist.
After considering these factors, we conclude the trial court abused its discretion in excluding the testimony of Cliffe. This error interdicted the trial court's judgment on the award for lost wages. None of the other issues in this case were affected by the exclusion of this testimony.
Because Louisiana appellate courts have jurisdiction over the facts in a civil case, such a prejudicial error does not require a remand. La. Const. of 1974, art. V, § 10; La.C.C.P. art. 2164. Ordinarily, trial court findings of fact are reviewed on appeal under the manifest error (clearly wrong) standard [Arceneaux v. Domingue, 365 So.2d 1330 (La.1978)] and trial court quantum awards are reviewed on appeal under the abuse of discretion standard [Reck v. Stevens, 373 So.2d 498 (La.1979)]. However, where one or more trial court errors interdict the trial court's fact finding and/or quantum award process, the manifest error (clearly wrong) standard and/or the abuse of discretion standard are no longer applicable, and, if the record is otherwise complete, the appellate court can make its own independent (de novo) review of the record and decide the case. McLean v. Hunter, 495 So.2d 1298 (La.1986); Picou v. Ferrara, 483 So.2d 915 (La.1986); Suhor v. Gusse, 388 So.2d 755 (La.1980); and the cases cited therein. We will make an independent review of the record on the issue of lost wages.[6]
Dr. Boudreaux's January 7, 1990, report computed Jordan's lost income as $142,942.81. To arrive at this figure, Boudreaux first determined that Jordan had an estimated work-life of 8.97 years from the date of the accident. He then estimated Jordan's annual income capacity based on an average of his past income which came to $24,901.35 per year.[7] Boudreaux then added on fringe benefits Jordan would be expected to receive had he not been injured. He then figured the present value of Jordan's future income using a discount rate of 8%, real interest rates of 2.5% to 5.5%, and income growth at a rate of 0% to 5% per year. From this data Boudreaux arrived at the $142,942.81 figure for total lost wages. This calculation is based on the premise that Jordan is totally and permanently disabled.
*1153 Dr. G. Richard Thompson, plaintiff's expert in economics, also testified about Jordan's lost earning capacity. Dr. Thompson computed the present value of Jordan's lost past and future earnings as being $315,875.00. The only information available to Dr. Thompson when this calculation was made was Jordan's 1987 W-2 forms. Those forms show a 1987 income of $38,179.69; however, Jordan's 1987 tax return, which was not supplied to Dr. Thompson, shows an income of only $28,553.15. When showed this tax return on cross-examination, Dr. Thompson recalculated the value of Jordan's lost earnings as $236,230.00. Dr. Thompson also did not have Jordan's 1988 tax return which shows a pre-accident income of $6,862.05.[8] The testimony of an expert witness is to be received and weighed in the same manner as any other evidence. Cooper v. Olinde, 565 So.2d 978 (La.App. 1st Cir.), writ denied, 569 So.2d 966 (La.1990). It is well settled that the weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based. When an expert opinion is based on assumed facts which are not supported by the record in the case, the opinion may be rejected. Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1st Cir.), affirmed, 574 So.2d 344 (La.1990).
The factual basis for Dr. Thompson's calculations was Jordan's 1987 W-2 form and 1987 income tax return. Dr. Boudreaux had Jordan's tax returns for 1987 and 1988 from which to compute lost earning capacity. Because Boudreaux had more facts about Jordan's finances available to him, we give more weight to his conclusions. We accordingly award Jordan $142,942.81 in lost wages.

VALIDITY OF DIRECTED VERDICT FOR MAINTENANCE AND CURE

(Assignment of error 1b)
IBC contends the trial court erred in granting Jordan's motion for a directed verdict on the issue of maintenance and cure. Specifically, IBC asserts whether a person is entitled to maintenance and cure is a question of fact for the jury to decide, there was insufficient evidence about Jordan's physical condition to support the trial court's finding that Jordan had not reached "maximum medical cure," and the trial court had no authority to set maintenance payments at a rate of $17.00 per day instead of the $8.00 per day called for in the collective bargaining agreement.
A motion for a directed verdict may be granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the mover's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. La.C.C.P. art. 1810; Barnes v. Thames, 578 So.2d at 1162.
The applicable general maritime law on the rights of a seaman to maintenance and cure is well established. When a seaman becomes ill or injured while in the service of his ship, the ship owner must pay him maintenance and cure, whether or not the shipowner was at fault or the ship unseaworthy. This obligation includes paying a subsistence allowance, reimbursing medical expenses actually incurred, and taking all reasonable steps to ensure that the seaman receives proper care and treatment. Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured; it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches "maximum medical recovery." Ambiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman. Porche v. Maritime Overseas Corp., 550 So.2d 278 (La.App. 4th Cir.1989).
"Maximum cure" (maximum medical recovery) is achieved when it is probable *1154 that further treatment will result in no betterment of the seaman's condition. Where it appears that the condition is incurable or that further treatment will merely relieve pain and suffering and not otherwise improve the physical condition, it is proper to declare the point of maximum medical cure. Simmons v. Hope Contractors, 517 So.2d 333 (La.App. 1st Cir.1987), writ denied, 518 So.2d 510 (La.1988).
IBC introduced no evidence to rebut the evidence showing Jordan (1) was injured while serving on IBC's ship, (2) had surgery to repair a disc, (3) continues to have pain, (4) is unable to return to his old job, and (5) needs additional testing to determine if he continues to have disc herniation. Nothing in the record shows Jordan reached maximum cure by the date of the trial.
Dr. Lea, who examined Jordan for IBC, testified that Jordan would not reach maximum medical cure until one year after a second surgery if such second surgery is required. Dr. Lea recommended that Jordan undergo further testing to determine the origin of his pain and determine whether additional surgery is needed. Jordan did not have this testing because he did not have the money to pay for it. The facts and inferences are so overwhelmingly in favor of the motion for directed verdict that reasonable men could not arrive at a contrary verdict. Accordingly, the trial judge did not err in granting Jordan's motion for a directed verdict.
Because we conclude Jordan is entitled to continued maintenance, we must determine whether the trial court erred in awarding maintenance at the rate of $17.00 per day instead of the $8.00 per day called for in the collective bargaining agreement.
Article II, Section 13, of the 1987 Standard Tanker Agreement between Seafarers International Union and Contracted Companies provides in pertinent part as follows:
MAINTENANCE AND CURE. When a member of the Unlicensed Personnel is entitled to maintenance and cure under Maritime Law, he shall be paid maintenance at the rate of eight dollars ($8.00) per day for each day or part thereof of entitlement. The payment due hereunder shall be paid to the man weekly.
The trial court relied on Barnes v. Andover Co., 900 F.2d 630 (3rd Cir.1990), in holding the contract was unenforceable. The holding in that case provided, in pertinent part, as follows:
In any event, we conclude that it is inconsistent both with the traditional doctrine of maintenance and with our rejection of preemption of maintenance by the labor laws to hold that the maintenance rate set in the collective bargaining agreement is binding on a seaman who can show higher daily expenses.
(Footnote omitted.) Barnes, 900 F.2d at 640. However, Barnes is a minority holding in the federal jurisprudence. The majority of the jurisprudence has taken a contrary view. Gardiner v. Sea-Land Service, 786 F.2d 943 (9th Cir.), cert. denied, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986). See also Al-Zawkari v. American Steamship Co., 871 F.2d 585 (6th Cir.1989); Macedo v. F/V PAUL & MICHELLE, 868 F.2d 519 (1st Cir.1989). While the United States Fifth Circuit has not decided a case involving this issue, a federal district court in Louisiana, in the case of Castro v. M/V AMBASSADOR, 657 F.Supp. 886 (E.D.La. 1987), followed Gardiner v. Sea-Land Service and the majority view in holding that an injured seaman was bound by the $8.00 maintenance rate provided for in the collective bargaining agreement. The majority view is more persuasive.
The trial court erred in calculating the maintenance award at a rate of $17.00 per day. The trial court determined that Jordan was entitled to 745 days of maintenance.[9] IBC has paid Jordan maintenance for 518 days. Therefore, IBC owed Jordan 227 days of maintenance at a rate of $8.00 per day for a total of $1,816.00. The judgment is amended to reduce it to that amount. The trial court's award of $2,529.20 for unpaid cure is correct and is affirmed.

*1155 MENTAL ANGUISH AND MENTAL PAIN AND SUFFERING

(Assignment of error 4)
IBC claims the trial court erred by awarding separate damages for "mental anguish" and "mental pain and suffering." IBC maintains these two items are the same and thus the awards are duplicative.
The verdict form (jury interrogatories) submitted to the jury had blanks for both "mental anguish" and "past and future mental pain and suffering." IBC did not object to the verdict form.
Under La.C.C.P. art. 1793(C) a party is prevented from assigning as error the giving or failure to give a jury instruction without objecting to the instruction. This article has been applied to special interrogatories. Crawford v. Bon Marche, 540 So.2d 376 (La.App. 1st Cir.1989).
This court faced a similar set of facts in Wisner v. Illinois Central Gulf Railroad, 537 So.2d 740 (La.App. 1st Cir.1988), writ denied, 540 So.2d 342 (La.1989). The jury interrogatories in that case had separate categories for "past and future mental anguish" and "emotional distress." The jury awarded $600,000.00 for each category. In rejecting a similar assignment of error, this court stated as follows:
The defendant cannot now complain of the form of the jury interrogatories unless he objected to them at trial either before or after their submission to the jury. His submission of alternative interrogatories does not constitute an objection. The objection must be specific and allow the trial judge an opportunity to correct the error. The submission of alternative interrogatories does not by itself alert the trial judge that the interrogatories of the other party are in error. The defendant must object to the specific interrogatory he considers duplicative.
537 So.2d at 751. Because IBC did not make an objection, it cannot raise this issue on appeal.
This assignment of error is without merit.

ENTITLEMENT TO PUNITIVE DAMAGES

(Assignment of error 1)
IBC claims the jury erred in finding it arbitrary and capricious in failing to pay maintenance and cure and, as a result, awarding punitive damages.
Louisiana appellate courts have jurisdiction to review questions of law and fact in all civil cases. La. Const. art. 5, §§ 5 and 10. Federal appellate courts have jurisdiction only to review questions of law in civil jury trials. U.S. Const. amend. VII. In federal court, when a civil jury has made factual findings upon correct instructions, the only inquiry on review is whether there was sufficient evidence to sustain these findings. Granberry v. O'Barr, 866 F.2d 112 (5th Cir.1988); Nunez v. Superior Oil Co., 572 F.2d 1119 (5th Cir.1978). When a judge has made factual findings, these findings are reviewed under "the clearly erroneous standard." Fed.R.Civ.P. 52(a); Musial v. A & A Boats, 696 F.2d 1149 (5th Cir.1983). In Louisiana, a factual finding is reviewed under the manifestly erroneous-clearly wrong standard, unless the factual finding has been interdicted by error. Rosell v. Esco, 549 So.2d 840 (La.1989). In maritime actions brought in state court, federal substantive law applies; but where the result is not substantially affected, the procedural law of the forum applies. Lavergne v. Western Co., 371 So.2d 807 (La. 1979); Cason v. Diamond M Drilling Co., 436 So.2d 1245 (La.App. 1st Cir.), writ denied, 441 So.2d 1221 (La.1983). Thus, state courts are not required to apply Rule 52(a) (the clearly erroneous standard of review), a rule of federal civil procedure, to their own systems for reviewing factual determinations of trial judges. Icicle Seafoods v. Worthington, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986); Daigle v. Coastal Marine, 488 So.2d 679 (La.1986). State courts apply their own system for reviewing factual determinations of juries in general maritime law cases. Simmons v. Hope Contractors, 517 So.2d at 336.
Upon receiving a claim for maintenance and cure, the shipowner need *1156 not immediately commence payments; he is entitled to investigate and require corroboration of the claim. If, after investigating, the shipowner unreasonably rejects the claim, when in fact the seaman is due maintenance and cure, the owner becomes liable not only for the maintenance and cure payments, but also for compensatory damages. These are the damages that result from the failure to pay, such as the aggravation of the seaman's condition. If the shipowner, in failing to pay maintenance and cure, has not only been unreasonable but has been more egregiously at fault, he will be liable for punitive damages and attorney's fees.[10]This higher degree of fault has been described in such terms as callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent. Thus, there is an escalating scale of liability: a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable for compensatory damages. When the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well. Heaton v. Gulf International Marine, 536 So.2d 622 (La. App. 1st Cir.1988); Morales v. Garijak, 829 F.2d 1355 (5th Cir.1987). Punitive damages are recoverable for acts which are willful, wanton, and in callous disregard of a claim of maintenance and cure. The conduct required to grant an award of punitive damages requires an element of bad faith. Simmons v. Hope Contractors, 517 So.2d at 336.
Despite the language of the collective bargaining agreement which requires maintenance to be paid weekly, the record shows IBC delayed payments by as much as nine and one-half months. At the time of trial, IBC owed Jordan 227 days in unpaid maintenance.
IBC claims "maintenance payments were delayed because medical reports to corroborate Jordan's continued need for medical treatment were not provided." IBC, or its attorneys, had full knowledge of Jordan's injuries, surgery, medical treatment, and continued disability. This was proven by (1) the testimony of Mr. Bell, (2) the November 20, 1989, letter, with the attached medical bills, (3) Jordan's answers to IBC's interrogatories, and (4) the testimony from Dr. Lea who was retained by IBC to examine Jordan. IBC produced no evidence to the contrary. IBC did not call any witness who had knowledge of IBC's handling of this case.
After a thorough review of the record, we cannot say that the jury was clearly wrong in finding IBC arbitrary and capricious and awarding punitive damages.
This assignment of error is without merit.

CONSTITUTIONALITY AND EXCESSIVENESS OF PUNITIVE DAMAGE AWARD

(Assignment of error 5)
IBC asserts its constitutional right to due process was violated by the award of punitive damages. It contends the award is constitutionally defective on three grounds: (1) the standards on which the jury based the award are unconstitutionally vague; (2) the award is excessive and grossly out of proportion to any wrongdoing of IBC; and (3) the preponderance standard of proof on the punitive damages issue does not comport with procedural due process.
The issues of constitutionality of the standards on which the award was based and the standard of proof were not raised at the trial court level but were raised for the first time on appeal. Because of this, we decline to consider the merits of these issues. See Rule 1-3, Uniform RulesCourts of Appeal; State v. *1157 Madere, 352 So.2d 666 (La.1977); Dent v. Department of Corrections, 460 So.2d 57 (La.App. 1st Cir.1984). The issue of constitutional excessiveness of the punitive damages award is properly before this court. We need not address this constitutional issue, however, because we find the award is excessive under Louisiana law.
Among the factors relevant in determining the amount of a punitive damage award are: (1) the nature and extent of the harm to the plaintiff; (2) the wealth or financial situation of the defendant; (3) the character of the conduct involved; and (4) the extent to which such conduct offends a sense of justice and propriety. Courts generally use these factors as guides to determine whether a punitive damage award will best achieve the purposes of punishment and deterrence. J. Bolin, Enter Exemplary Damages, 32 La.B.J. 216 (1984). See also Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).
Louisiana appellate courts have applied the abuse of discretion standard of review in determining whether the amount of a trial court's punitive damage award is excessive. Varacalle v. Turner, 556 So.2d 836 (La.App. 1st Cir.1989); Chinigo v. Geismar Marine, 512 So.2d 487 (La.App. 1st Cir.), writ denied, 514 So.2d 457 (La. 1987). If an abuse of discretion is found in a damage award, a Louisiana appellate court will lower the award only to the highest (or raise the award only to the lowest) point which is reasonably within the discretion afforded the trial court; the appellate court may not substitute its judgment for that of the trier of fact. Reck v. Stevens, 373 So.2d 498 (La.1979).
An application of the pertinent factors cited above to the facts of this case shows the following: (1) Jordan was unable to pay his daily living expenses or get needed medical care as a result of IBC's nonpayment of maintenance and cure; (2) there is no evidence in the record pertaining to the financial status of IBC; (3) IBC's conduct in delaying and/or refusing the payments to Jordan was arbitrary and capricious; and (4) IBC's choice to save a relatively small amount of money rather than fulfill its obligation to care for one of its employees injured on its vessel offends a sense of justice.
Under the facts and circumstances of this case, a punitive damage award of $1,000,000.00 is a clear abuse of the jury's much discretion. IBC was arbitrary and capricious in failing to pay $1,816.00 in maintenance and $2,529.20 in cure, a total of $4,345.20. However, IBC's conduct does not support a punitive damage award of this size. After considering all the relevant factors to be used in determining punitive damages, we conclude the highest amount of punitive damages to which Jordan is reasonably entitled under the particular facts and circumstances of this case is $500,000.00.

INTEREST
IBC alleges the trial court erred in awarding legal interest from the date of judicial demand on both the compensatory and punitive damage awards.[11] Prejudgment interest is not recoverable in a Jones Act case tried to a jury. Prejudgment interest is an issue for the jury in a general maritime unseaworthiness claim; it is usually awarded unless there are unusual circumstances which would make an award of such interest inequitable. Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 443 n. 1 (5th Cir.1991); McPhillamy v. Brown & Root, 810 F.2d 529, 532 n. 1 (5th Cir.1987); Frank Maraist, Admiralty in a Nutshell 349 (1983). When a Jones Act and an unseaworthiness claim are tried together to a jury, the prevailing view under federal law is that the plaintiff is not entitled to prejudgment interest unless the jury allocates the award between the two theories of recovery. Where, as here, there is no evidentiary footing for separating the damages caused by unseaworthiness and Jones Act negligence and hence no realistic basis for apportioning damages, there can *1158 be no award of prejudgment interest. Borges, 935 F.2d at 443; McPhillamy, 810 F.2d at 531-532. Thus, the trial court erred in awarding prejudgment interest on the compensatory damages awarded by the jury.
The trial court also erred in awarding prejudgment interest on the punitive damages award. Under both Louisiana and federal law, a plaintiff is entitled to interest on punitive damages only from date of judgment. Alexander v. Burroughs Corp., 359 So.2d 607, 613-614 (La. 1978); Malbrough v. Wallace, 594 So.2d 428, 438 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992); United States v. Reul, 959 F.2d 1572 (Fed.Cir. 1992); Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831 (2d Cir.1992).[12] We thus must amend the judgment to reflect interest only from date of judgment, June 27, 1990, on the awards for lost wages, mental anguish, physical pain and suffering, mental pain and suffering, and punitive damages.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to (1) reduce the award for lost wages to $142,942.81, (2) reduce the award for maintenance to $1,816.00, and (3) reduce the punitive damages award to $500,000.00. The judgment of the trial court is amended to award legal interest only from date of judgment, June 27, 1990, on the awards for lost wages, mental anguish, physical pain and suffering, mental pain and suffering, and punitive damages. In all other respects, the judgment of the trial court is affirmed. IBC is cast for all costs of this appeal.
AFFIRMED IN PART; AMENDED AND AFFIRMED IN PART.
GONZALEZ, J., I respectfully dissent and agree with the reasons of SHORTESS, J., and assign additional reasons.
SHORTESS, J., dissents with reasons.
SHORTESS, Judge, dissenting.
Jordan's lead attorney took the stand and testified on the plaintiff's behalf. The jurors chatted with the plaintiff on the courthouse steps during the trial. I disagree with the result reached by the majority because, in my opinion, the cumulative effect of these two facts deprived IBC of a fair trial.

Jordan's Attorney as a Witness
I disagree with the majority's analysis of this issue and its conclusion "Bell was properly permitted to testify." In State v. Miller, 391 So.2d 1159, 1162 (La.1980), the court stated that while an attorney may be a competent witness, the issue is not the admissibility of his testimony but the propriety of allowing him to assume the dual role of advocate and witness. The admission of Bell's testimony, standing alone, may have been harmless error. Combined with the juror misconduct in this case, however, it resulted in prejudice to IBC.

Juror Misconduct
IBC moved for a mistrial based on a conversation during the trial between three or four of the jurors, the plaintiff, and the plaintiff's son. The trial court examined the jurors in private and denied the motion, finding mistrial was "a bit too harsh a remedy for the situation" because "there is no harm done to either side...." The majority affirms, finding IBC failed to show it was "`impossible to reach a proper judgment' in this case."
The majority cites Usner v. Strobach, 591 So.2d 713 (La.App. 1st Cir.1991), writ denied, 592 So.2d 1289 (La.1992), in which the trial judge denied a motion for mistrial based on his factual observation that tales *1159 jurors who were also courthouse employees were not prejudiced against the plaintiff. I dissented in that case because I believe the seating of courthouse employees who knew the defendant as tales jurors was prejudicial misconduct which deprived the plaintiff of a fair trial, even though it was impossible for the plaintiff to prove prejudice. Usner, 591 So.2d at 731 (Shortess, J., dissenting). Similarly, in this case, it was impossible for the defendant to prove plaintiff's conversation with the jurors during the trial prejudiced them in his favor. It is obvious, however, that when a party converses with several of the jurors during the course of the trial, he establishes a rapport with those jurors which could subliminally prejudice those jurors in his favor.
The combination of the juror misconduct and the testimony of plaintiff's lead counsel effectively denied the defendant a fair trial. I would reverse and remand for a new trial. However, since the record is complete and acknowledging the scope of appellate review in these situations, a de novo review of the record would be an appropriate course of action.
I respectfully dissent.
GONZALES, Judge, concurring in part and dissenting in part.
The majority concludes that a $1,000,000 punitive damage award for failure to pay $4,345.20 is a clear abuse of discretion and lowers the award to $500,000. I submit that a $500,000 punitive damage award under the facts of this case is an abuse of discretion.
An examination of other awards demonstrates how disproportionate the award herein is. The majority opinion fails to cite any punitive damage award for failure to pay maintenance and cure that approaches the $500,000 award in this case. The largest punitive damage award that has been found was $296,240 for failure to pay $8,760 in maintenance and cure in Gaspard v. Taylor Diving & Salvage Co., Inc., 649 F.2d 372 (5th Cir.1981). The next largest punitive damage award found for a failure to pay maintenance and cure was $175,000 in Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3rd Cir.1984). In that case the defendant did not pay cure of $17,743 to plaintiff who had undergone surgery for the removal of two discs and needed additional surgery. Defendant also terminated maintenance payments after a year for no reason. In Porche v. Maritime Overseas Corporation, 550 So.2d 278 (La. App. 4th Cir.1989), $100,000 in punitive damages were awarded. In that case, the plaintiff was injured on October 28, 1985, and defendant did not pay cure until January 12, 1987, despite having knowledge that plaintiff had undergone two surgeries on his knee. Also, the defendant only paid a few months of maintenance during that time period. These punitive damage awards are at the high end of the scale in maintenance and cure cases. See, for example, Simmons v. Hope Contractors, Inc., 517 So.2d 333 (La.App. 1st Cir.1987), writ denied, 518 So.2d 510 (La.1988), where the court awarded $25,000 in punitive damages for a failure to pay $6,260 in maintenance and cure.
After considering all the relevant factors that go into awarding punitive damages, I conclude that the highest amount of punitive damages that Jordan is reasonably entitled to under the particular facts and circumstances of this case is $150,000.
NOTES
[1] Jordan now resides in Port Allen, Louisiana, with his adult son.
[2] As of the time of trial, Jordan's outstanding medical bills had been reduced to $2,529.20, by payments from the Seafarers Welfare Plan.
[3] Even if the trial court erred by allowing this testimony, it was harmless error. See, Deer Slayers v. Louisiana Motel and Investment Corp., 434 So.2d 1183 (La.App. 1st Cir.), writ denied, 440 So.2d 151 (La.1983).
[4] Dr. Boudreaux prepared three reports. Two of the reports contain this language.
[5] Although Cliffe's testimony was not proffered, the parties stipulated that such testimony would follow the reports.
[6] One of Dr. Boudreaux's reports computes lost wages based on Jordan's shortened life expectancy. Jordan contracted lung cancer and had a portion of one of his lungs removed. The trial court granted Jordan's motion in limine excluding any evidence dealing with Jordan's cancer or his shortened life expectancy. On appeal no error is assigned for this ruling. Accordingly, we will not review the report that considers a shortened life expectancy in making a determination on the issue of lost wages.
[7] This average was computed using Jordan's 1987 and 1988 tax returns.
[8] Jordan did not file tax returns in 1984, 1985 and 1986 despite the fact he claimed to have earned $50,000 in 1984 and $45,000 in 1986. He had no income in 1985 due to the fact he was in prison.
[9] $12,665.00 divided by $17.00 = $745.00.
[10] The trial court did not award attorney's fees, and Jordan has not appealed or answered the appeal to assign this as error.
[11] The trial court did not award interest on the maintenance and cure award. Jordan did not appeal; the issue of Jordan's entitlement to interest on that award is not before us.
[12] We note the plaintiff failed to pray for interest on the punitive damages award. The granting of interest on this maritime issue is a matter of federal substantive law. Federal law is clear that "a meritorious claim will not be rejected for want of a prayer for appropriate relief." Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978); F.R.C.P. 54(c). The result would be the same were Louisiana law applied. See Mini Togs Products v. Wallace, 513 So.2d 867 (La.App. 2d Cir.), writs denied, 515 So.2d 447, 515 So.2d 451 (La.1987).