680 So.2d 771 (1996)
Jane BROUSSARD, et ux.
v.
Gerald STACK, M.D., et al.
No. 95 CA 2508.
Court of Appeal of Louisiana, First Circuit.
September 27, 1996.
*772 Harry T. Widmann, Metairie, for Plaintiffs/Appellants, Jane Broussard and Roger Broussard.
Peter Dazzio, Baton Rouge, for Defendant/Appellee, Woman's Hospital.
Vance A. Gibbs, Baton Rouge, for Defendant/Appellee, Gerald Stack, M.D.
Before CARTER, PARRO and McDONALD,[1] JJ.
CARTER, Judge.
This appeal arises out of a trial court judgment in a suit for medical malpractice.

BACKGROUND
In 1985, Jane and Roger Broussard were expecting their first child. During the initial stages of her pregnancy, Jane was under the treatment of Dr. Michael Schexnayder until August, 1985. In September, 1985, when a change in medical coverage provided by Jane's employer necessitated a change in obstetricians, Dr. Gerald Stack became Jane's obstetrician. Jane's scheduled due date was October 27, 1985. The course of Jane's pregnancy was routine and uneventful, until delivery.
On November 4, 1985, Jane's pregnancy was approximately forty-one weeks gestational age. Dr. Stack examined Jane on the morning of November 4. At that time, Jane was dilated three to four centimeters. At approximately 3:00 p.m. that afternoon, pursuant to Dr. Stack's instruction, Jane was admitted to the labor and delivery ward at Woman's Hospital in Baton Rouge, Louisiana, under the care of Dr. Stack. At approximately 6:00 p.m., Dr. Stack examined Jane, at which time she was dilated five centimeters. At that time, Dr. Stack ruptured Jane's membranes, and her contractions intensified. Approximately one hour later, Jane was administered an epidural to alleviate her discomfort.
At approximately 9:00 p.m., Dr. Stack examined Jane again. On this examination, Jane was dilated approximately eight centimeters. Dr. Stack also began the administration *773 of Pitocin at that time.[2] The administration of Pitocin was discontinued forty-five minutes later when Jane had progressed another centimeter. Between 9:30 p.m. and 10:15 p.m., Dr. Stack noticed the presence of a caput (swelling on the top of the baby's head).
At approximately 10:15 p.m., Jane was at rim dilation, which meant that she was fully dilated except for the presence of the rim of the cervix. At approximately 11:15 p.m., Dr. Stack attempted to determine the position of the presenting part by locating the baby's ear to determine which way the head was facing. Upon finding that the head was facing sideways, Dr. Stack attempted to manually rotate the child so a vaginal delivery could be accomplished. When Jane did not progress any further as a result of the attempt at manual rotation, Dr. Stack determined that a cesarean section might be necessary and had Jane prepared for such procedure. At approximately 12:20 a.m. on November 5, 1985, when Jane was fully dilated, Dr. Stack attempted a second manual rotation. When that attempt was also unsuccessful, Dr. Stack performed a cesarean section at 12:45 a.m. Three minutes later, at 12:48 a.m., Kelly Broussard was born. During the birth process, a small amount of meconium got below Kelly's vocal cords.
After Kelly's birth, Jane was permitted to visit with Kelly frequently. During these visits, Jane observed scratches and a pocket of blood on Kelly's head. In addition, Jane noticed that Kelly's right eye was puffy. At approximately 3:30 a.m., Jane attempted to nurse Kelly, but Kelly was crying and was somewhat fussy. Jane saw Kelly again for a 5:30 a.m. feeding. At that time, Kelly screamed the entire time. During this visit, Jane observed that Kelly's right side was "jumping." During the following visit at 8:30 a.m., Jane again observed that Kelly was making jerking movements. The nurse also observed these movements.
Thereafter, Dr. Cassandra S. Diamond, a pediatrician, examined Kelly and performed various tests on her. Dr. Diamond advised the Broussards that Kelly was experiencing seizures. Later testing revealed that Kelly had swelling of her brain and that she had suffered a stroke. Kelly was later diagnosed as having suffered a cerebral hemorrhage in the left frontal lobe, which caused permanent neurological damage, including hemiparesis (partial paralysis of the right side of the body), language impairment, and decreased cognitive recall.
The Broussards subsequently filed a complaint against Dr. Stack for his alleged malpractice and requested review by a medical review panel. On October 21, 1987, the three-member medical review panel unanimously concluded that the documentary evidence did not support the conclusion that Dr. Stack failed to comply with the appropriate standard of care.

FACTS
On January 21, 1988, Jane and Roger Broussard, individually and on behalf of their minor child, Kelly, filed a suit for medical malpractice against Dr. Stack and Woman's Hospital.[3] In their petition, the Broussards alleged that Dr. Stack was negligent in failing to accomplish the delivery in accordance with the standards of obstetrical practice, failing to properly monitor the fetal heart rate, and failing to recognize and timely respond to fetal distress. In response, Dr. Stack filed an answer, denying the allegations of the Broussards' petition and averring that, at all relevant times, he possessed the degree of knowledge and skill ordinarily possessed by physicians licensed and certified to practice in the community and/or within his field of specialty and that he exercised reasonable care and diligence, along with his best judgment, in the application of that skill and knowledge. In his answer, Dr. Stack, alternatively, alleged plaintiffs' fault and fault of a third party. In an amended answer, Dr. Stack asserted the provisions of LSA-R.S. 40:1299.42 with regard to the limitations of recovery.
*774 Thereafter, the matter proceeded to a trial by jury. On February 22, 1995, the jury rendered the following verdict:
1. (A) Do you find that Dr. Gerald Stack breached the standard of care ordinarily practiced by physicians within the medical specialty of obstetrics/gynecology in connection with the birth of Kelly Broussard?
 YES ____ NO X 
If the answer to Question 1(A) is "NO", please sign at the end of this sheet and return it to the bailiff.
1. (B) Do you find that Kelly Broussard suffered any injury as a result of the breach of the standard of care by Dr. Gerald Stack?
 YES ____ NO ____
If the answer to Question 1(B) is "NO", please sign at the end of this sheet and return it to the bailiff.
If the answer to Question 1(B) is "YES", then proceed to answer Questions 2, 3, 4, 5 and 6.
2. What sum of money would fairly and adequately compensate Kelly Broussard for:
Medical Expenses; $______________
Loss of Earning Capacity; $______________
Physical pain and suffering, past, present, and future; $______________
Mental anguish and distress and loss of enjoyment
of life, past, present, and future; $______________
Physical disability, impairment, and disfigurement. $______________
You may or may not find damages in one or more of the above categories. Each blank must be filled in, either with a dollar amount or with a zero.
PROCEED TO QUESTION 3
3. Do you find that Jane Broussard has suffered severe and debilitating injury as a result of her witnessing the injuries suffered by Kelly Broussard?
 YES ____ NO ____
If your answer to Question 3 is "YES", Proceed to Question 4. If your answer to Question 3 is "NO", proceed to Question 5.
4. What sum of money would fairly and adequately compensate Jane Broussard for her mental anguish and emotional distress?
$_________________
PROCEED TO QUESTION 5
5. Do you find that Roger Broussard has suffered severe and debilitating injury as a result of his witnessing the injuries suffered by Kelly Broussard?
 YES ____ NO ____
If your answer to Question 5 is "YES", proceed to number 6. If your answer to Question 5 is "NO", sign the form and return it to the Bailiff.
6. What sum of money would fairly and adequately compensate Roger Broussard for his mental anguish and emotional distress?
$____________
Baton Rouge, Louisiana, this ____ day of
February, 1995.
s/ George S. Roberts
FOREPERSON
2/22/95
DATE
On March 17, 1995, the trial court rendered judgment in accordance with the jury's verdict, in favor of Dr. Stack, dismissing, with prejudice, all claims of plaintiffs, Roger Broussard, individually and on behalf of his minor daughter, Kelly Broussard, and Jane Broussard. The Broussards were cast with all court costs, including expert witness fees.
On March 29, 1995, the Broussards filed a motion for judgment notwithstanding the verdict (JNOV) and, alternatively, for a new trial.[4] By judgment, dated April 26, 1995, *775 the Broussards' motions were denied at their cost.
The Broussards filed a motion for appeal from the March 17 and April 26, 1995, judgments. In their appeal, the Broussards assigned the following errors:[5]
1. The Court below erred by failing to grant plaintiffs' Motion for Judgment Notwithstanding the Verdict because a reasonable jury could not have arrived at a verdict for the defendant.
2. The Court below committed error by not granting plaintiff's Motion for New Trial on peremptory grounds because the verdict of the jury is clearly contrary to the law and the evidence.
3. The Court below erred by not granting plaintiff's Motion for New Trial on discretionary grounds when the defendant intentionally withheld from plaintiffs newly-discovered information which contradicted defendant's deposition testimony and then used the new evidence to unfairly ambush the plaintiffs' expert witness on cross-examination.

JUDGMENT NOTWITHSTANDING THE VERDICT OR, ALTERNATIVELY, NEW TRIAL
The Broussards contend that the trial court erred in refusing to grant their motion for judgment notwithstanding the verdict and in refusing to grant the motion for new trial. The Broussards reason that the evidence established that Dr. Stack breached the applicable standard of care and that, as such, the trial court erred in refusing to grant the requested relief.
In support of their position that Dr. Stack breached the applicable standard of care, the Broussards presented the testimony of Drs. Michalik, Diamond, Goldstein, Kewalramani, and Stack.
Dr. Phillip J. Goldstein, an expert in obstetrics and gynecology, with a sub-specialty in maternal-fetal medicine, testified that, in preparing for his testimony, he reviewed Kelly's medical records, Jane's pre-natal and hospital records, the delivery records, and the deposition testimony of Jane and Dr. Stack, as well as his own deposition testimony. Dr. Goldstein testified that, in a normal delivery for a first-time mother, dilation should proceed at one centimeter per hour and descent of the fetal head should be in concert with dilation of the cervix. Dr. Goldstein testified that movement from four to ten centimeters would take approximately six hours. Dr. Goldstein noted that, in this case, from Jane's admission until 9:00 p.m., there was no descent of the fetal head, which should have raised a red flag for Dr. Stack. Because the fetal head was not descending, Dr. Goldstein felt that Dr. Stack should have made an assessment as to why there was a lack of descent. In his opinion, Dr. Stack's failure to do so was a breach of the standard of care.
Moreover, Dr. Goldstein testified that the applicable standard of care required the physician to examine the position of the fetus early during labor. According to Dr. Goldstein, the medical records reveal that Dr. Stack did not make any attempt to determine the position of the baby's head in the birth canal prior to 9:00 p.m. In Dr. Goldstein's opinion, this failure constituted a breach of the standard of care.
Dr. Goldstein also testified relative to the fetal heart monitor strips. Dr. Goldstein noted that the initial monitor strips revealed *776 a lack of beat-to-beat variability, which was non-reassuring evidence that the fetus may have been affected by recent or past events. Later monitor strips showed bradycardia (slowing of the fetal heart rate), a drop in the fetal heart tone, and late decelerations, which suggested that the fetus was continually assaulted by the influences that caused the decelerations. According to Dr. Goldstein, in terms of fetal health, such decelerations cause it to disintegrate.
On direct examination, Dr. Goldstein testified that the fetal monitor strips stopped running at 11:08 p.m. and that the attempts at manual rotation were not performed until after that time. Dr. Goldstein testified that Dr. Stack could have made attempts at manual rotation as early as 9:00 p.m., but he admitted that he would not have recommended manual rotation at that point. However, Dr. Goldstein stated that performing such maneuvers after aberrations of the fetal heart beat was a breach of the standard of care. On cross-examination, it was brought to Dr. Goldstein's attention that the original assumptions about the times on the fetal monitor strips were in error and that the fetal monitor strips were continued until almost midnight when Jane was brought into surgery for the cesarean section. However, on re-direct examination, Dr. Goldstein stated that the corrected times did not alter his opinion that it was a breach of the standard of care to attempt the second manual rotation.
The medical records also showed that Dr. Stack administered Pitocin. Dr. Goldstein testified that the risks associated with the use of Pitocin include uterine rupture and heart problems for the mother and reduction of circulation to the fetus. Dr. Goldstein opined that, when there are heart decelerations and the mother is receiving Pitocin, administration of the medication should be halted, which Dr. Stack did. Dr. Goldstein opined that the administration of Pitocin was not a breach of the standard of care.
Dr. Goldstein testified that cephalhematoma after birth is rare in an uncomplicated delivery. It is usually caused by prolonged delivery and/or the use of mechanical forces, such as efforts at manual rotation. Moreover, a subarachnoid bleed is rare in an uncomplicated delivery according to Dr. Goldstein. Trauma and asphyxia are the most likely causes of a subarachnoid bleed. Dr. Goldstein opined that Kelly suffered a central nervous system bleed, secondary to the second attempt at manual rotation. However, he admitted on cross-examination that he could not recall any cases in which manual rotation caused subarachnoid hemorrhage, unless there was a skull fracture or the use of forceps.
Dr. Laxman S. Kewalramani, an expert in physical medicine and rehabilitation and electrodiagnostics, testified that he evaluated Kelly in October, 1993. At that time, Dr. Kewalramani was provided with Kelly's medical history, which included an uneventful pregnancy, attempted manual rotations during delivery, abrasions and hematomas on the scalp after delivery, jerky movements fifteen hours after delivery, and phenobarbital treatment for seizures for seven months. Dr. Kewalramani's physical examination of Kelly revealed a sluggish upper right extremity, grossly intact cranial nerves, asymmetrical elevation of the right shoulder with narrowing of the right neck shoulder angle (which denoted a mild weakness of the shoulder girdle musculature), weakness of the right dorsiflexors of the ankle, mild-drift to the right side in finger-nose and heel-shin test, and weakness in the proximal and distal muscles in the right arm. Dr. Kewalramani testified that he had also reviewed the medical records on Jane's admission as well as Kelly's medical records, neurological reports, and numerous other reports on Kelly.
Dr. Kewalramani noted that Kelly's injuries included bruises along the left frontal parietal region and abrasions, and medical tests indicated a subarachnoid hemorrhage and cerebral edema (swelling) in the left temporal region. According to Dr. Kewalramani, these injuries revealed the presence of a right parieto-occipital cephalhematoma, which is a large collection of blood at the skull level, in the right parieto-occipital region (the area at the base of the skull, behind the ear). Dr. Kewalramani testified that Kelly's injuries occurred at the time of her birth and that such injuries were of traumatic *777 origin rather than metabolic or other intercranial pathology. Based on this history, Dr. Kewalramani concluded that Kelly suffered from right residual hemiparesis and mild expressive aphasia, secondary to subarachnoid and cortical hemorrhage.
According to Dr. Kewalramani, cephalhematoma is not commonly seen as a consequence of uncomplicated labor and delivery. He opined that these injuries were caused by forces applied to the fetal head prior to the cesarean section. He testified that manual rotation could contribute to the problem. However, Dr. Kewalramani testified that he personally had never performed a manual rotation and that he had no knowledge of the actual manner or techniques used in manual rotation. His knowledge about manual rotations was derived primarily from literature on the subject. Dr. Kewalramani admitted that forceps were used in all seven cases dealing with manual rotations and injury, which are discussed in the medical literature.
Dr. Joseph Michalik, Kelly's pediatrician, testified that he began treating Kelly when she was eight months old. Dr. Michalik testified that Kelly suffered from neurological problems, but that he had no opinion as to the cause of those problems.
Dr. Cassandra S. Diamond, a pediatrician, treated Kelly in the hospital in November, 1985, for jerky movements. Dr. Diamond testified that, because it was outside her area of expertise, she could not offer an opinion as to the cause of Kelly's problems.
In opposition to the testimony of the Broussards' witnesses, Dr. Stack presented the testimony of two labor nurses, the testimony of Drs. Robichaux and Hayes, and his own testimony.
Donna McBride testified that she was on duty as a labor nurse from 3:00 p.m. until 11:00 p.m. on November 4, 1985, when Jane was a patient at Woman's Hospital. McBride testified that Jane was admitted with mild, irregular contractions which were three to five minutes apart and thirty seconds in duration. At approximately 5:45 p.m., Jane's membranes were artificially ruptured. According to McBride, Jane's contractions then increased in intensity. Within an hour of the artificial rupture, an epidural was administered, and relief was obtained within thirty minutes. Thereafter, Jane's contractions slowed and were five to six minutes in duration and were stronger in intensity. A catheter was inserted at 9:25 p.m., which resulted in a drop in the fetal heart rate. Shortly before 10:00 p.m., Dr. Stack requested that Pitocin be re-started, but the administration of this medication was halted five minutes later. At 10:15 p.m., Jane's cervix was dilated at rim. At 10:45 p.m., the variability of the fetal heart rate was decreasing. McBride's shift ended at 11:00 p.m., at which time she made her report to Theresa Himel, who replaced her.
Theresa Himel testified that she was employed as a labor nurse by Woman's Hospital on November 5, 1985. Himel testified that she cared for Jane Broussard during her shift from 11:00 p.m. on the evening of November 4 through 7:00 a.m. on November 5, 1985. According to Himel, the time shown on panel 792 of the fetal heart monitor strip is 11:57 p.m.
Dr. Gerald Stack testified that, when he examined Jane in the hospital at 6:00 p.m., he loosened the membranes from her cervix in an effort to stimulate her contractions and start the onset of her labor. He examined her periodically and, at 11:15 p.m. when Jane was at rim, he examined her to determine the presentation of the baby.
Dr. Stack explained that the presentation or presenting part means the manner in which the baby is being presented for delivery, namely whether the baby is head first or rear first. Dr. Stack testified that, as long as the baby is vertex (head first), it does not make any difference as to which direction the baby is faced. Dr. Stack noted that, during the normal course of delivery, the baby's head will rotate. In his 11:15 p.m. examination, Dr. Stack determined that there was an occiput transverse presentation.
Dr. Stack noted that a manual rotation is attempted only when there is little or no cervix present. According to Dr. Stack, it is physically impossible to perform a manual rotation when the patient is only four centimeters dilated. Moreover, he would not do so when the patient is six centimeters and still *778 progressing. Dr. Stack testified that performing a manual rotation when the mother is only six centimeters dilated would damage the cervix.
Dr. Stack further testified that a child will not deliver in a transverse position. Therefore, when Jane was at rim and the baby was not facing the correct direction, Dr. Stack attempted to manually rotate the baby. Dr. Stack described his attempts at manual rotation as follows:
Basically, like I said, you place your hand in the vaginal vault, locate the ear so that you know where your landmarks are, you place your fingers on one side of the head, thumb on the other side, and then try to roll the head. In this particular case, the child was looking to the side. You try to roll it so that the child is either looking down or looking up, so either occiput anterior or occiput posterior, which would then facilitate a delivery.
According to Dr. Stack, his attempt at manual rotation lasted approximately fifteen seconds. Thereafter, when Jane did not progress any further, he ordered that she be prepared for a cesarean section. Dr. Stack testified that he attempted manual rotation again shortly before he commenced the cesarean section, which was also unsuccessful. In Dr. Stack's opinion, there was no evidence of fetal distress to suggest that the cesarean section was required immediately. Rather, the pattern of bradycardia and decreased variability, which occurred between the first and second attempts at manual rotation, could be attributed to the Pitocin, catheterization, and manual rotation. Dr. Stack explained that a decrease in the fetal heart tone during manual rotation is the normal vagal response to the use of manual rotation because the pressure of the fetal head compresses the vagal nerve.
Dr. Stack acknowledged that he diagnosed a caput, which is a normal occurrence during vaginal delivery. Dr. Stack explained that a caput forms when the fetal head is under pressure. The presence of a caput did not cause him undue concern in that the only babies who do not have a caput are cesarean section babies. Dr. Stack explained that the normal labor process exerts more force on a baby's head than any attempt at manual rotation.
Dr. Stack further testified that a small amount of meconium got below Kelly's vocal cords during the birthing process. Dr. Stack surmised that Kelly may have taken a breath before she was suctioned out. Moreover, Dr. Stack noted that Kelly's APGAR measures for fetal tone, movement, color, heart rate, and cry were eight to nine, which is average for a vigorous, healthy baby. Further, Dr. Stack stated that he used his best judgment in delivering Kelly.
Dr. Alfred G. Robichaux, III, an expert in obstetrics and gynecology and maternal fetal medicine, testified that, in preparing for his testimony, he had reviewed the medical records of Jane and Kelly Broussard, the fetal heart monitor strips, and the deposition testimony of Dr. Stack.
Dr. Robichaux testified that the records reveal that Jane was four to five centimeters dilated at 5:40 p.m., such that he would have expected her to be fully dilated five to six hours later between 10:40 and 11:40 p.m. Dr. Robichaux noted that, given that Jane was at rim at 10:15 p.m., her labor was within a reasonable range of progress. Moreover, Dr. Robichaux testified that Dr. Stack's concern at 11:15 p.m. was appropriate.
According to Dr. Robichaux, there is no reason to determine the position of the fetal head when the patient is dilated four centimeters. Rather, Dr. Robichaux opined that a determination of the position of the fetal head should be made at full dilation. Therefore, Dr. Stack acted appropriately in waiting until 11:15 p.m. to make this assessment.
With regard to the use of Pitocin, Dr. Robichaux noted that, during the final stage of labor, it is reasonable to use the medication. When there is a decrease in the fetal heart rate, it was Dr. Robichaux's opinion that reduction or cessation of the use of Pitocin is appropriate as was done in this case.
With regard to the fetal heart monitor strips, Dr. Robichaux noted that, when the mother is on her back, there is a decrease in the blood supply to the fetus, which results in a decrease in the fetal heart rate.
*779 With regard to the use of manual rotation, Dr. Robichaux testified that such practice is acceptable. Moreover, Dr. Robichaux testified that Dr. Stack's second attempt at manual rotation was within the standard of care. It was also Dr. Robichaux's opinion that the use of fundal pressure[6] while performing the manual rotation was appropriate.
According to Dr. Robichaux, Dr. Stack did not deviate from the standard of care. Dr. Robichaux explained that the first stage of labor had been managed appropriately. During the final stage of labor, in order to expedite delivery, Dr. Stack performed the required maneuvers and then proceeded to perform a cesarean section when those maneuvers were unsuccessful.
Dr. Robichaux observed that, immediately following her birth, Kelly's APGAR scores were excellent and that there was no indication of distress until almost twelve hours after her birth. Dr. Robichaux acknowledged that Kelly's injuries most likely occurred during labor. However, Dr. Robichaux noted that, based upon his experience, manual rotation does not cause subarachnoid hemorrhage. It was Dr. Robichaux's opinion that the cephalhematoma resulted from forces of labor within the birth canal.
Dr. Evelyn Kimberlin Hayes, an expert in obstetrics and gynecology, testified that she served on the medical review panel with Drs. Schneider and Ward. As a member of the review panel, Dr. Hayes reviewed the medical records for labor and delivery, the fetal heart monitor strips, the deposition of Dr. Stack, and Kelly Broussard's medical records. Dr. Hayes testified that, it was her opinion, when the review panel rendered its opinion, that Dr. Stack had not breached the standard of care. At trial, Dr. Hayes testified that her opinion had not changed and that she was still of the opinion that Dr. Stack had not breached the standard of care.
Dr. Hayes testified that it was not a breach of the standard of care to permit Jane to progress to forty-one weeks. Moreover, Dr. Hayes noted that the standard of care for evaluating the position of the fetus for birth is to determine fetal position after the mother has reached full dilation rather than during the initial stage of labor. Moreover, Dr. Hayes testified that it is not a breach of the standard of care to attempt manual rotation of a fetus. Dr. Hayes explained that, once a patient is at rim, manual rotation may eliminate the rim and permit the fetus to become better positioned. Dr. Hayes also noted that the second attempt at manual rotation in this case was appropriate after full dilation. Dr. Hayes opined that there was nothing in the fetal monitor strips to suggest that the cesarean section should have been performed earlier. Moreover, it was appropriate to cease administration of Pitocin at the time that Dr. Stack did so.
Dr. Hayes also noted that it was not in her experience for manual rotation to cause subarachnoid hemorrhage. Rather, according to Dr. Hayes, trauma is the major cause of subarachnoid hemorrhage. In fact, the molding of the head in the vaginal canal is sometimes sufficient trauma to cause subarachnoid hemorrhage. The medical records reveal that there was no skull fracture. Further, Dr. Hayes opined that a subarachnoid hemorrhage cannot be predicted, nor is it preventable and, in her opinion, the most likely cause of Kelly's subarachnoid hemorrhage was the forces of labor.
Dr. Hayes testified that, in rendering its opinion, the medical review panel took the fetal heart monitor strips into consideration, but the strips were difficult to decipher because of the lack of times on the strips. The panel noticed that there were three late decelerations, but Dr. Hayes noted that there could be numerous causes for such decelerations. Generally, persistent lack of beat-to-beat variability could mean a decrease in oxygen. Moreover, a drop in fetal heart rate meant a reduction in the delivery of oxygen.

A. JNOV.
In ruling on a motion for judgment notwithstanding the verdict (JNOV) under LSA-C.C.P. art. 1811, the trial court is required to employ the following legal standard: A JNOV should be granted only if the *780 trial court, after considering the evidence in the light most favorable to the party opposed to the motion, finds it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on that issue. Porche v. Winn-Dixie Louisiana, Inc., 93-2075 p.3 (La.App. 1st Cir. 10/7/94); 644 So.2d 699, 702, writ denied, 94-2643 (La. 12/16/94); 648 So.2d 394; Petitto v. McMichael, 588 So.2d 1144, 1147 (La.App. 1st Cir.1991), writ denied, 590 So.2d 1201 (La.1992); Barnes v. Thames, 578 So.2d 1155, 1168 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991); Lilly v. Allstate Insurance Company, 577 So.2d 80, 83 (La.App. 1st Cir.1990), writ denied, 578 So.2d 914 (La.1991). The trial judge must construe the evidence and make inferences in favor of the party opposing the motion. Porche v. Winn-Dixie Louisiana, Inc., 644 So.2d at 702; Petitto v. McMichael, 588 So.2d at 1147. Additionally, in applying this standard, the court cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury. Porche v. Winn-Dixie Louisiana, Inc., 644 So.2d at 702; Petitto v. McMichael, 588 So.2d at 1147; Barnes v. Thames, 578 So.2d at 1169. If there is substantial evidence opposed to the motion of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion must be denied. Petitto v. McMichael, 588 So.2d at 1147; Barnes v. Thames, 578 So.2d at 1169. Stated more simply, a trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Lilly v. Allstate Insurance Company, 577 So.2d at 83.
The standard to be applied by the appellate courts in reviewing the grant or the denial of a JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous. Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La. App. 2nd Cir.1991); Petitto v. McMichael, 588 So.2d at 1147; Barnes v. Thames, 578 So.2d at 1169.
Considering all of the evidence and the reasonable inferences to be made therefrom in favor of Dr. Stack, we cannot say that the trial judge was manifestly erroneous in denying the Broussards' motion for JNOV. In their appellate brief, the Broussards admitted that the opinions of Dr. Stack's expert witnesses differed completely from the opinion of Dr. Goldstein with regard to whether Dr. Stack breached the standard of care. The law is clear that, in considering a JNOV, the court cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury. Indeed, if there is substantial evidence opposed to the motion of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion for JNOV must be denied. Based upon the record before us, we cannot say that the jury's verdict is one which reasonable people could not have rendered. Reasonable persons could have arrived at the same verdict given the evidence presented to the jury. As such, we find that the trial judge was not manifestly erroneous in denying the JNOV.

B. NEW TRIAL.
LSA-C.C.P. art. 1972 provides as follows:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
In addition to the above, a discretionary ground for a new trial is set forth in LSA-C.C.P. art. 1973, which authorizes a trial court to grant a new trial in any case if there is good ground therefor. Porche v. Winn-Dixie Louisiana, Inc., 644 So.2d at 702; *781 Garrett v. Universal Underwriters, 586 So.2d 727, 729 (La.App. 3rd Cir.1991).
The motion for new trial requires a less stringent test than for a JNOV in that such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Gibson v. Bossier City General Hospital, 594 So.2d at 1336. In considering a motion for new trial, the trial judge is free to evaluate the evidence without favoring either party; he may draw his own inferences and conclusions and may evaluate the credibility of the witnesses to determine if the jury has erred in giving too much credence to an unreliable witness. Smith v. American Indemnity Insurance Company, 598 So.2d 486, 493 (La.App. 2nd Cir.), writ denied, 600 So.2d 685 (La.1992); Petitto v. McMichael, 588 So.2d at 1149.
In such a posture, a trial court may deny a motion for JNOV (where all of the evidence must be viewed in the light most favorable to the opposing party) and grant a motion for new trial because the verdict is contrary to the law and the evidence (where the trial judge can make his own inferences and credibility determinations). See Pellerin v. Tudor Construction Company, 414 So.2d 403, 406 (La.App. 1st Cir.), writ denied, 420 So.2d 455 (La.1982), cert. denied, 479 U.S. 824, 107 S.Ct. 96, 93 L.Ed.2d 47 (1986).
When considering a motion for new trial, the trial judge has wide discretion. LSA-C.C.P. art. 1971; Porche v. Winn-Dixie Louisiana, Inc., 644 So.2d at 702. The fact that a determination on a motion for new trial involves discretion does not imply that the trial court can freely interfere with any verdict with which it disagrees. Porche v. Winn-Dixie Louisiana, Inc., 644 So.2d at 702. Moreover, the denial of a motion for new trial should not be reversed, unless there has been an abuse of the trial court's discretion. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 p.44 (La.App. 1st Cir. 3/11/94); 634 So.2d 466, 493, writ denied, 94-0906 (La. 6/17/94); 638 So.2d 1094; Fletcher v. Langley, 93-624 p.3 (La.App. 3rd Cir. 2/2/94); 631 So.2d 693, 695, writ denied, 94-0521 (La. 4/7/94); 635 So.2d 1139; Gibson v. Bossier City General Hospital, 594 So.2d at 1336. Louisiana jurisprudence does not favor new trials, especially when the judgment is supported by the record. Fletcher v. Langley, 631 So.2d at 695.
In their motion for new trial, the Broussards contended that good ground existed for granting a new trial in that, pursuant to LSA-C.C.P. art. 1428, Dr. Stack was obligated to supplement his deposition testimony prior to trial. The Broussards contended that, two days prior to the trial, defense counsel learned that Dr. Stack had testified incorrectly in his deposition regarding the timing of the fetal heart monitor strips and communicated this information to the other defense witnesses. However, according to the Broussards, their expert witness was deprived of this information. Thereafter, when the Broussards' expert witness, Dr. Goldstein, testified that the change in Dr. Stack's testimony did not alter his opinion regarding the breach of the standard of care by Dr. Stack, the change in the testimony created the impression that change in Dr. Goldstein's opinion was necessitated.
In opposition to the Broussards' motion for new trial, Dr. Stack contended that the evidence supports the jury's verdict that he did not breach the standard of care. Dr. Stack reasoned that the fetal heart monitor strips and the times pertinent thereto were not "new evidence" and that Dr. Stack's deposition testimony before the medical review panel revealed the time discrepancy. Moreover, Dr. Stack contended that no prejudice resulted.
LSA-C.C.P. art. 1428 addresses the supplementation of responses and provides as follows:
A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be *782 called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.
(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which he knows that the response was incorrect when made, or he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.
The vast majority of the jurisprudence interpreting this provision involves the failure of a party to respond to interrogatories and disclose witnesses who will testify at the trial on the merits. In those situations, the courts have held that the trial judge has the discretionary power to allow or disallow the testimony of a witness at trial when a party has failed to satisfy a duty to supplement answers to interrogatories. Jordan v. Intercontinental Bulktank Corporation, 621 So.2d 1141, 1151-52 (La.App. 1st Cir.), writs denied, 623 So.2d 1335, 1336 (La.1993), certiorari denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994). See also Belk v. Montgomery Ward and Company, Inc., 501 So.2d 1008, 1013 (La.App. 2nd Cir.1987). When a party has not satisfied the technicality of supplementing responses to interrogatories, the reviewing court can look to the record for a willful or negligent failure to disclose names of witnesses in determining whether the trial judge abused his discretion. Jordan v. Intercontinental Bulktank Corporation, 621 So.2d at 1152.
The jurisprudence also reveals that the power to disallow the testimony should be exercised only when the ends of justice dictate the exclusion of the testimony, Jordan v. Intercontinental Bulktank Corporation, 621 So.2d at 1152, and that any doubt must be in favor of receiving the testimony. Belk v. Montgomery Ward and Company, Inc., 501 So.2d at 1013. However, the jurisprudence also reveals that the failure to object to the right of a witness to testify by a party's counsel may constitute a waiver of an otherwise valid objection to the witness based upon the ground the party calling the witness breached his duty to supplement prior answers to written interrogatories. Gilchrist v. Ozone Spring Water Company, 93-2515 (La.App. 4th Cir. 6/30/94); 639 So.2d 489, 498-99; Abdon Callais Boat Rentals, Inc. v. Louisiana Power and Light Company, 555 So.2d 568, 575-76 (La.App. 1st Cir. 1989), writ denied, 558 So.2d 583 (La.1990); Belk v. Montgomery Ward and Company, Inc., 501 So.2d at 1013.
In the instant case, without determining whether LSA-C.C.P. art. 1428 applies to discovery depositions, we note that the Broussards did not lodge any objection to the cross-examination of Dr. Goldstein relative to the erroneous times of the fetal heart monitor strips. In the cross-examination of Dr. Goldstein, the defense questioned him about the possible erroneous assumptions regarding the times on the fetal monitor strips. After the conclusion of the cross-examination, the Broussards requested a short recess in light of this testimony prior to redirect examination, which was granted by the trial court. Dr. Goldstein then testified on re-direct that the time changes in the fetal heart monitor strips did not alter his determination relative to the breach of the standard of care. Thereafter, when the Broussards called Dr. Stack to the stand and questioned him about why the defense had not disclosed its discovery about the erroneous time assumptions on the fetal monitor strips, they were met with an objection of relevancy. In the exchange with the court which followed the defense objection, the Broussards argued that, when Dr. Stack learned that his deposition testimony about a specific time was erroneous, he was under an obligation to inform the Broussards in order to avoid a "trial by ambush." After sustaining the objection, the trial judge advised the Broussards that they may be entitled to some relief, and he advised the jury that the relief referred to was a continuance. However, the Broussards did not request a continuance. Moreover, the deposition, which allegedly reveals that Dr. Stack's testimony *783 as to a specific time for the fetal heart monitor strips, was never introduced into evidence, nor was it proffered. As a result, the record does not contain the deposition testimony.[7] Further, in Dr. Goldstein's testimony, he stated that he calculated the times on the fetal heart monitor strips himself, based upon the medical records. He did not testify that he relied upon Dr. Stack's alleged deposition testimony.
In the instant case, in oral reasons for judgment on the motions, the trial judge stated his personal disagreement with the verdict as follows:
It's a very difficult decision because the court sees where reasonable people could obviously differ from the jury. The jury heard all the arguments. Iperhaps I'm being unfair in saying they didn't understand the evidence. I didn't think they did, but they are the jury. It's very tough because I think that if thisthis is my personal observation of the evidence is that if the doctor would not have embarked on this aggressive attempt that this child would not have the serious brain damage that it has today.... [T]he Code of Civil Procedure [article] 1972 provides that a new trial can only be granted if the verdict appears clearly contrary to the law and the evidence. I'm not going to supplant my opinion for the jury. I'm simply stating for the record that I'm not very sure the jury digested this evidence; that is speculation on my part and not sufficient to grant a new trial.
These comments, however, indicate that the trial judge did not find his disagreement sufficient to grant a new trial. The trial judge's comments indicate he believed that the evidence could support the jury's finding that Dr. Stack did not breach the applicable standard of care. The trial judge apparently did not feel that the allegations by the Broussards relative to the changes in the times on the fetal heart monitor strips, even if substantiated, constituted good grounds for the granting of a new trial. We find that the trial judge did not err in refusing to grant a new trial.

CONCLUSION
For the above reasons, the judgment of the trial court, denying the motions for new trial and judgment notwithstanding the verdict, is affirmed. The Broussards are cast for all costs.
AFFIRMED.
NOTES
[1] Judge J. Michael McDonald, Nineteenth Judicial District Court, is serving as judge pro tempore, by special appointment of the Louisiana Supreme Court.
[2] Pitocin is a medication which causes the uterus to contract.
[3] By judgment, dated February 13, 1995, the Broussards voluntarily dismissed their claims against Woman's Hospital.
[4] The original record lodged with this court contained a copy of the motion for JNOV and, alternatively, for a new trial, filed on March 30, 1995, which was outside the seven-day delay for the filing of such motions. On the court's own motion, a rule to show cause issued, requesting that the parties show cause why the appeal should not be dismissed as having been filed untimely. Thereafter, the record was supplemented to include a copy of the motion, which had been filed with the clerk of court via facsimile transmission on March 29,1995. As a result, the appeal is properly before us.
[5] We note that, although the motion for appeal reveals that the Broussards appealed both the judgment on the jury's verdict and the judgment denying the motions for JNOV and new trial, the assignments of error and the arguments in the Broussards' brief do not address any error in the jury's findings. Therefore, the issue of whether the jury erred in finding that Dr. Stack did not breach the standard of care is not before us on appeal. However, the propriety of the underlying jury verdict, insofar as it relates to the denial of the motions for JNOV and new trial, is properly before us.
[6] Fundal pressure is the application of external pressure to the top of the mother's abdomen to assist in pushing the baby through the birth canal.
[7] In opposition to the motion for new trial, Dr. Stack attached excerpts of the deposition testimony to his memorandum. However, those excerpts were not introduced into evidence at the hearing on the motion for new trial.