626 So.2d 420 (1993)
Grady C. WEEKS, et al., Plaintiffs-Appellants,
v.
T.L. JAMES & CO. INC., et al., Defendants-Appellees.
No. 92-508.
Court of Appeal of Louisiana, Third Circuit.
October 27, 1993.
Writ Denied January 28, 1994.
*421 Stephen Patrick Callahan, Houma, for Grady C. Weeks et al.
*422 Richmond Minor Eustis and W. Malcolm Stevenson, New Orleans, for T.L. James & Co. Inc., et al.
Nora Feibleman McAlister, New Orleans, for Ebasco Constructors, Inc.
Before STOKER, YELVERTON, THIBODEAUX, COOKS and SAUNDERS, Judges.
THIBODEAUX, Judge.
Plaintiffs seek damages growing out of a breach of an allegedly unambiguous contract entered into by Ebasco Constructors, Inc. and Dale Rogers & Sons, Inc. on November 7, 1988, which granted a servitude to Ebasco over property owned by Rogers & Sons. This servitude allowed Ebasco to lay a temporary 30 inch diameter discharge line across the property during the construction of a hydroelectric plant near Vidalia, Louisiana. The contract obligated Ebasco to put forth its best efforts to obtain a revised 404 permit from the Corps of Engineers to fill as many borrow pits and wetlands as economically possible.
Plaintiffs, Grady C. Weeks, et al (Weeks), the present owners of the property, appeal from the judgment of the district court which found that, although Ebasco failed to commit its best efforts to obtain a revised 404 permit which would have allowed it to fill the borrow pits to ground level with spoil from the dredged areas, it was impossible for Ebasco to fulfill its obligation as contemplated by the parties. The lower court determined that the intent of the parties was to fill the borrow pit to ground level or not at all. Because the Corps of Engineers' permit allowed the pit to be filled up to 18 inches below ground level, Ebasco's obligation was extinguished. Weeks also appeals the district court's finding of $21,000.00 in damages for curative work on the property due to Ebasco's failure to restore the property as the parties had contracted.

FACTS
On November 7, 1988, Bruce C. Bennett, the Ebasco Assistant Project Manager, entered into a written contract with Dale Rogers, the property owner representing Rogers & Sons. The contract is reproduced below:

AGREEMENT
The below listed parties hereby agree to the following;
Mr. Dale Rogers, agrees to permit Ebasco and their subcontractors the use of his property for the purpose of laying a temporary 30" diameter dredge discharge line between the Sidney A. Murray Jr. Hydroelectric Project and the Corps of Engineers Low Sill Structure Outflow.
As full and complete compensation for this permission Ebasco Constructors commits their best efforts to obtain a revised 404 permit from the Corps of Engineers and all other required permits to fill as many ponds and wetlands as economically possible.
Upon receipt of all approvals the above described ponds and/or wetlands will be filled to the limits permitted by the above mentioned permits.
The above agreement was signed by Dale Rogers (who could not read nor write the English language but could sign his name), Bennett, and a witness. This contract was incidental to the construction of the Sidney A. Murray, Jr. Hydro-Electric Plant located about thirty miles south of Vidalia, Louisiana. The project envisioned that water from the Mississippi River would be diverted through a constructed channel into the Red and Atchafalaya Rivers. The Mississippi waters would flow through the hydroelectric plant and generate electricity.
In addition to the obligations detailed in the agreement above, representatives of Ebasco acknowledge that Ebasco agreed to restore the property to its pre-construction condition.
Because the property involved in this litigation has been designated as "wetlands" by the United States Army Corps of Engineers, all work involving construction upon the property or the filling of pits must be permitted by the Corps of Engineers pursuant to Section 404 of the Clean Water Act; hence, the need for Ebasco to secure the 404 permit for the project. The permit issued to Ebasco *423 allowed the two borrow pits, designated as Z-11, to be filled to an elevation of 1.5 feet below surrounding ground level because of the Department of Interior's desire to maintain the area as a wetlands habitat. Ebasco and its subcontractors refused to fill the Z-11 borrow pits to the elevation permitted by the 404 permit. They successfully argued at trial that they were bound to fill to ground level only or not at all.
The trial court found that Ebasco's failure to commit its best efforts to obtain the revised 404 permit was insignificant since the permit restriction of the level at which the pits could be filled to 1.5 feet below ground level made performance impossible.

ISSUES
The issues are:
(1) Whether the trial court erroneously disregarded the language of the contract to determine the parties' intent;
(2) Whether Ebasco was in bad faith in not expeditiously pursuing the issuance of a revised 404 permit from the Corps of Engineers;
(3) What amount of damages were sustained by plaintiffs if the contract was breached?
(4) What amount of damages is appropriate for restoring the plaintiffs' property to its pre-construction condition?
For the following reasons, we find that Ebasco breached the agreement with the plaintiffs and award damages on the written agreement for $100,000.00. The judgment of the trial court is reversed on these two issues. In all other respects, the judgment appealed from is affirmed.

LAW AND DISCUSSION

I. The Contract
Ebasco's argument that its obligation to fill the pits was extinguished because it was subject to a suspensive condition of receiving a revised 404 permit allowing it to fill the pits to surface level is specious but ultimately untenable. We agree with the plaintiffs. The trial court's initial inquiry should have been whether the words of the contract clearly and explicitly set forth the intent of the parties. This methodology limits the interpretation of a contract to the internal language of the contract itself.
LSA-C.C. art. 2046 provides:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
This court has long recognized that where the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document. Tammariello Properties, Inc. v. Medical Realty Company, Inc., 549 So.2d 1259 (La.App. 3d Cir.1989). The agreement in this case, like other contracts, is the law between the parties, and no further interpretation may be made in search of the parties' intent when the words of the contract are clear and explicit and lead to no absurd consequences. Massachusetts Mutual Life Ins. Co. v. Nails, 549 So.2d 826 (La.1989). The courts are obligated to give legal effect to such contracts according to the true intent of the parties. Borden v. Gulf States Utilities Co., 543 So.2d 924 (La.App. 1st Cir.1989), writ denied, 545 So.2d 1041 (La.1989). Whether a contract is ambiguous or not is a question of law. Id. When appellate review is not premised upon any factual findings made at the trial level but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. AcadiEnergy, Inc. v. McCord Exploration Co., 596 So.2d 1334 (La.App. 3d Cir.1992); Conoco, Inc. v. Tenneco, Inc., 524 So.2d 1305 (La.App. 3d Cir.1988), writ denied, 525 So.2d 1048 (La.1988). Further, the rule of strict construction does not authorize a perversion of language or the exercise of inventive powers for the purpose of creating an ambiguity where none exists. It does not authorize a court to make a new contract for the parties or disregard the evidence as expressed, nor does it refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties. Massachusetts Mutual Life Ins. Co., supra at 832.
*424 American Mfg. Corps. v. National Union Fire Ins. Co., 203 La. 515, 14 So.2d 430, 433 (La.1942), cited with approval by this court in Petry v. Richard, 532 So.2d 286, 289 (La. App. 3d Cir.1988), writ denied, 533 So.2d 382 (La.1988) and in Taylor v. Woodpecker Corp., 539 So.2d 1293, 1296 (La.App. 3d Cir.1989), stated that:
"The court will not presume, that parties make use of words in their contracts to which no meaning is attached by them. Some effect is to be given to every word if possible; and rarely will the court reject words or phrases in a contract as surplusage."
A more recent Supreme Court case, John Bailey Contractor, Inc. v. State, through DOTD, 439 So.2d 1055 (La.1983) teaches that parties to a contract will not be imputed with using language that is meaningless or without effect. By finding that Ebasco did not have the obligation to fill the borrow pits unless the revised 404 permits allowed the pits to be filled to surface level, the district judge rendered the last paragraph of the agreement meaningless and without effect. That paragraph clearly and unambiguously states that "[u]pon receipt of all approvals the above described ponds and/or wetlands will be filled to the limits permitted by the above mentioned permits."
When doubt exists as to the true sense of the words or phrases, each contract provision must be explained by reference to other provisions, words or phrases used in the same contract. LSA-C.C. art. 2050. If a provision has two different meanings, it must be interpreted with the meaning that renders it effective rather than ineffective and best conforms to the subject of the contract. LSA-C.C. arts. 2048, 2049.
Both Weeks and Ebasco argue that the explicit language of the contract supports their position. Ebasco asserts that the phrase "to fill" in the agreement can best be defined with reference to the Town of Vidalia's application for an amendment to the 404 permit permitting the borrow pits to be filled above grade. Ebasco further asserts that the intent of the parties was "to fill" the borrow pits for pasture or not at all. Weeks suggests that the agreement was for Ebasco or its subcontractors to fill the pits to whatever limit the 404 permit allowed. We agree with the Weeks's position. To do otherwise would render the phrase "... ponds and/or wetlands will be filled to the limits permitted by the above ... permits," nugatory.
Ebasco neglects to construe the second paragraph of the agreement with the last paragraph which clearly states "... the above described ponds ... will be filled to the limits permitted by the above mentioned permits." From that language, it is clear that the parties envisioned the possibility of being issued a permit that would not allow the pits to be filled to the surface or above. Furthermore, the testimony of Rogers as to the possibility of Ebasco encountering trouble getting a permit to "fill the middle because they'd just have to fill as high as the Corps would let them fill it ..." indicates that Ebasco's obligation to fill the Z-11 pits was not conditioned on the Corps of Engineers issuing a permit allowing them to fill the pits to the surface.
Our decision is further buttressed by Ebasco's own admission. In its brief, it represents that "[a]lthough in disagreement as to intent, both appellants and appellee represent that the memorandum of agreement is clear and unambiguous." (Emphasis supplied).
A court is not to be concerned with the wisdom or folly of a contract. It cannot annul or amend it simply to avoid some supposed hardship arising therefrom. Its duty is confined to the ascertainment of the limits of the rights and obligations of the contracting parties as they have defined them for themselves. Schwarz v. Bourgeois, 422 So.2d 1176 (La.App. 4th Cir.1982), writ denied, 429 So.2d 153 (La.1983). In Billingsley v. Bach Energy Corp., 588 So.2d 786 (La.App. 2d Cir.1991), our brethren in the second circuit stated that a court cannot undermine a contract simply because it was, as in this situation, a bad deal for one of the parties. As unfortunate as the result will be for Ebasco, we agree.
The express language of the contract between Rogers & Sons and Ebasco did not suspensively provide that Ebasco's obligation *425 to fill the borrow pits was conditioned upon the Corps of Engineers issuing a revised 404 permit allowing the pits to be filled to the surface. Moreover, because the third paragraph of the agreement clearly and expressly provided for the ponds and/or wetlands to be filled to whatever limits the permit allowed, we conclude that the trial court's decision is not supported by the clear provisions of the agreement. The agreement does not contemplate that Ebasco's obligation was to fill the ponds to the surface or not at all.

II. Ebasco's Efforts
We now address the Weeks's second assignment of error that the trial court erred in failing to find Ebasco was in bad faith in its attempt to secure a revised 404 permit allowing the borrow pits to be filled at least to surface level.
In his written reasons for judgment, the trial judge stated that Ebasco did not use its best efforts in obtaining a revised 404 permit because there was a seventeen month delay between the agreement and the issuance of the revised permits on April 11, 1990. Bad faith does not mean the mere breach of faith in not complying with a contract, but it is a designed breach of it from some motive or ill will. Williams v. Coe, 417 So.2d 426 (La.App. 1st Cir.1982). Comment (b) to LSA-C.C. art. 1997 states: "An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." The determination of whether Ebasco was in bad faith in not complying with the requirements of the agreement is a factual determination to be made by the trial court and therefore subject to the manifest error clearly wrong standard of appellate review. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even though this court may feel that its own evaluations and inferences are as reasonable. Id. When findings are based on determinations regarding the credibility of witnesses, the manifest error clearly wrong standard demands great deference to the trier of fact's findings. Id. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992).
After considering the record viewed in its entirety in the present case, we conclude that the trial court committed no error in rejecting, in accepting, or in weighing the conflicting evidence on the issue of Ebasco's bad faith.
One final point must be made regarding Ebasco's failure to use its best efforts to obtain a revised 404 permit. Ebasco acquiesced in the Department of Interior's objection to the original permit request. This resulted in the imposition of the 18 inch below ground limitation level by the Corps of Engineers. Despite its inaction, Ebasco now wishes to exculpate itself from liability because of its inaction. Our view is that Ebasco should not benefit from its own misconduct.

III. Damages for Breach of Contract
We have already determined that Ebasco breached its contractual obligation to fill the Z-11 borrow pits to the limit allowed by the 404 permit. The question now is whether the Weekses are entitled to damages and, if so, what amount in damages will compensate them for Ebasco's failure to fulfill its obligation. The trial court did not address the issue of damages for breach of the contract. Thus, this court is required to assess the evidence anew from the record and render a judgment on the merits as if it was the trial court, rather than remand the case for further proceedings below. Hogan v. Hogan, 549 So.2d 267 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). Accordingly, we must be guided by the precepts of the Civil Code Articles as to damages for breach of conventional obligations.
LSA-C.C. art. 1994 provides:
An obligor is liable for the damages caused by his failure to perform a conventional obligation.
A failure to perform results from nonperformance, defective performance, or delay in performance.
As stated in the Official Revision comment to C.C. art. 1994, the word "breach" was replaced *426 by the phrase "failure to perform" and states the three kinds of noncompliance with a conventional obligation. In the instant case, there was a nonperformance of Ebasco to fill the Z-11 borrow pits to the limits permitted by the revised 404 permit. Thus, the articles in the damage section dealing with conventional obligations govern Ebasco's contractual liability. See, LSA-C.C. art. 1994 Comment (b).
The code's basic outline for the assessment of damages is found within the rules for conventional obligations. First, damages are measured by the loss sustained by the obligee and the profit by which he has been deprived. LSA-C.C. art. 1995. However, when damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. LSA-C.C. art. 1999. Even if the extent of loss sustained is not capable of exact proof, recovery of a reasonable amount is permitted, as determined within the factfinder's discretion.
Ebasco suggests that the Weeks plaintiffs have suffered no loss or, at best, their loss should be $5,362.00, which is the cost per acre of property, $383.00, times 14 acres, the size of the land which includes the Z-11 pits. The Weekses paid $1.1 million for 2,876 acres in 1990. Conversely, the Weeks plaintiffs demand damages in the amount of $954,000.00. This figure represents the cost of having a contractor fill the Z-11 borrow pits to within 1.5 feet of ground level, using 370,000 cubic yards of fill at $1.70 per cubic yard plus the cost of mobilizing and demobilizing dredge equipment.
Neither position is tenable. The record does not contain any evidence of the present value of the land, or the diminution to its value as a result of Ebasco's nonperformance, or the enhanced value of the land if Ebasco had filled the pits to within 1.5 feet of ground level. It is certainly plausible, and human and economic experience confirms this, that the plaintiffs' land value would have appreciated, perhaps substantially, if Ebasco had performed its obligation. This observation is made even more poignant, we think, because of the location of the hydroelectric plant near plaintiffs' property. However, to award $954,000.00 for approximately .5 of 1 percent of property whose total purchase price less than three years ago was $1.1 million would be inordinately disproportionate to the damages caused.
It is clear to us that the plaintiffs have suffered some damages because of Ebasco's failure to perform. What is equally clear is the difficulty in assessing those damages. The record does not provide any real concrete guideposts for the imposition of an award with exactitude. However, to hold that the Weekses are without a monetary remedy would sanction Ebasco's wrongful conduct and would suggest that lawful agreements between parties can be broken with impunity. This we decline to do. Under these circumstances, we are left to exercise our reasonable discretion under Article 1999 of the Louisiana Civil Code and fix the amount as best we can. See, e.g., Brantley v. Tremont & Gulf Railway Co., 75 So.2d 236 (La.1954); Gaharan v. State, Through DOTD, 579 So.2d 420 (La.1991); J. Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896 (La.1981); The Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993).
In the case sub judice, we find that an award of $100,000.00 is appropriate to compensate the Weekses for Ebasco's failure to perform its contractual obligation to fill the borrow pits to the limit authorized by the Corps of Engineers' 404 permit.

IV. Damages for Restoration of the Property
The trial judge's written reasons for judgment states:
"While it is not specifically mentioned in the agreement, the restoration of the property to its prior condition was envisioned... the property was not properly restored, if any attempt to restoration was made at all. There is substantial evidence... that the property was not as it had been before the pipeline was laid.... Gilbert Stoufflet, an expert in the cost of levee construction and destruction, testified the property could be restored to its prior condition for the cost of $21,000 ... based on two earth machines being moved *427 in and out of the field and operated for ... 130 hours each during the restoration process. This cost is awarded to the petitioners...
The proper review has been defined by this court in Savoie v. Judice, 458 So.2d 659, 660, 661 (La.App.3d Cir.1984):
"The function of an appellate court in reviewing a damage award is not to decide what it considers an appropriate award on the basis of the evidence, but rather only to review the exercise of the trier of fact's discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); ... A reviewing court might disagree with amount of the award..., but it should not substitute its opinion for that of the trier of fact. Appellate review of awards for damages is limited to determining whether the trial court abused its much discretion. Kalmn, Inc. v. Empiregas Corp., 406 So.2d 276 (La.App.3d Cir. 1981)." Savoie, supra at 660, 661.
The Supreme Court further provides, in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) and in Reck v. Stevens, supra, that before a reviewing court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award.
In order to affirm the lower court's judgment, the record must reveal that a reasonable basis exists for the findings of the trier of fact, and that these findings are not manifestly erroneous. See, Savoie v. Judice, supra, at 661.
We agree with Ebasco. Weeks did not present substantial evidence that additional fill dirt was necessary. The trial court, therefore, did not abuse its discretion in failing to grant an award of damages for $50,000.00 representing the cost of additional fill material. We affirm the decision of the trial court in granting $21,000.00 to Weeks for the cost of the equipment to perform the restoration work.

CONCLUSION
For the foregoing reasons, the judgment of the district court as it relates to Ebasco's obligation to restore the Weeks' property and its assessment of damages pertaining to Ebasco's breach of that obligation, as well as its decision pertaining to Ebasco's lack of bad faith in breaching the agreement is affirmed; the trial court's judgment as it relates to the breach of contract action involving filling the Z-11 borrow pits to the limits allowed by the revised 404 permits issued by the Corps of Engineers is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment in favor of the plaintiffs, Weeks, and against the defendant, Ebasco, in the amount of ONE HUNDRED THOUSAND AND NO/100 ($100,000.00) DOLLARS with legal interest thereon from the date of judicial demand until paid. Finally it is ordered that all costs of this appeal are to be borne by Ebasco Constructors, Inc.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
STOKER, J., concurs in part and dissents in part and assigns written reasons.
STOKER, Judge, concurring in part and dissenting in part.
I agree in part with the majority holding in this case but dissent in part. The majority affirms the trial court's award of $21,000 to restore the plaintiffs' land to its original condition but reverses to award $100,000 as compensation for the temporary use of the servitude for the laying of the discharge line needed by Ebasco Constructors, Inc. I agree that the plaintiffs are entitled to $21,000 to restore their land to its original condition. If $100,000 is a fair price for the temporary use, the majority's decision may be equitable. However, it is not what the contract provided for. I agree with the trial judge in his denial of recovery for temporary use of the land.
In contracting with Ebasco the landowner (then Dale Rogers) accepted as "full and complete compensation" a hope that Ebasco could "obtain a revised 404 permit from the Corps of Engineers and all other required permits to fill as many ponds and wetlands as economically possible." In turn Ebasco agreed to use its best efforts to do just that. As it turned out, Dale Rogers's hope did not come to complete fruition. Ebasco could not obtain the necessary permits to fill all the *428 borrow pits to ground level. To me the word fill means fill fully, that is to the level of the surrounding ground. That is what the trial judge concluded. Extrinsic evidence adduced at trial demonstrated that the filling to the brim was what Dale Rogers contemplated and that filling to within eighteen inches of the surrounding of the land would not suit Rogers's purposes. Rogers wanted to fill the borrow pits to convert them to grazing, and filling them to only eighteen inches below the surface would only pose a hazard to cattle grazing.
The trial court held that Ebasco did not use its best efforts to obtain the revised 404 permits necessary to completely fill the borrow pits, but his reasoning is related to tardiness of Ebasco in processing the necessary applications. However, the trial court then held this tardiness was immaterial because the permit or permits to fill the Z-11 pits to ground level were going to be denied in any event. In agreeing to use its best efforts to obtain the permits, it would seem that Ebasco agreed to use its best persuasive powers to convince the governmental agencies to grant them. There is no evidence that Ebasco did not use its best persuasive powers. Nevertheless, as the trial court held, even the most persuasive efforts by Ebasco would not result in the government granting permission to convert the land from wet lands to pasture lands.
In contracting, Mr. Rogers sought to gain by having all of his borrow pits filled to ground level. That gain was a hope, a hope conditioned on Ebasco obtaining governmental permission to do so. The hope was not completely realized. If Mr. Rogers had wanted monetary compensation for the temporary use of his land, he could have required that such a provision be included in the contract. He only contracted for the hope.
My views would be as indicated above even if the plaintiffs reaped no benefit in exchange for the temporary use of the land. Plaintiffs' borrow pit designated as Z-8 was filled under a permit that was granted. It was the Z-11 borrow pits for which no permit was forthcoming. The majority opinion treats this case as if none of plaintiffs borrow pits were filled.