820 So.2d 1228 (2002)
Steven BERTRAND
v.
AIR LOGISTICS, INC. and Air Logistics, L.L.C.
No. 01-1655.
Court of Appeal of Louisiana, Third Circuit.
June 19, 2002.
*1230 Michael Kevin Cox, Kevin L. Camel, Cox, Cox, Filo & Camel, Lake Charles, for Jessica Bertrand Adams, Scott Bertrand, Renee Bertrand.
Francis J. Barry, Jr., Robert E. Kerrigan, Jr., Marc J. Yellin, Walter P. Maestri, Deutsch, Kerrigan & Stiles, New Orleans, for Air Logistics, L.L.C., Air Logistics, Inc.
Richard K. Christovich, Christovich & Kearney, New Orleans, for Allison Engine Company, Inc.
Thomas W. Thorne, Jr., Lemle & Kelleher, New Orleans, for Reliance National Indemnity Company.
William J. Crain, c/o Jones Fussell, L.L.P., Covington, for James A. George, George & George, Ltd.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN, and GLENN B. GREMILLION, Judges.
SULLIVAN, Judge.
This litigation arises out of a November 1, 1997, helicopter accident in the Gulf of Mexico. All of the parties involved appealed. For the following reasons, we affirm.

Facts
On November 1, 1997, Steven Bertrand was employed by Coastal Oil and Gas Corporation as a drilling supervisor. Mr. Bertrand's job duties required him to travel among drilling platforms in the Gulf of Mexico. On the morning of the accident, he was being transported by a Bell 206L-3 helicopter, powered by an Allison 250-C30 engine, when it experienced a loss of power. The pilot successfully performed an auto-rotated landing in the Gulf of Mexico. As a result of the accident, Mr. Bertrand injured his back while escaping from the helicopter into a life raft. After conservative treatment proved unsuccessful, he had to undergo surgery for a herniated disk at L4-5. He also suffered from depression and post-traumatic stress disorder because of the accident. Sadly, he committed suicide on September 30, 1999.
Prior to his death, Mr. Bertrand filed suit against Air Logistics, L.L.C., Air Logistics, Inc. (Air Logistics), and Allison Engine Company, Inc. (Allison). After his death, Mr. Bertrand's wife, Rene, his son, Scott, and his daughter, Jessica, were substituted as Plaintiffs. They amended Mr. Bertrand's petition to assert wrongful death and loss of consortium claims. Air Logistics filed a third party claim against Allison, seeking indemnity for Mr. Bertrand's claims against it and alleging Allison's responsibility for economic losses it incurred as a result of the accident.
*1231 Plaintiffs' claims for wrongful death and loss of consortium and Air Logistics' third party demand against Allison for economic damages were dismissed by the trial court pursuant to motions for partial summary judgment filed by Allison. On April 24-27 and May 2, 2001, the matter was tried before a jury which awarded Plaintiffs $400,000.00 in damages for Mr. Bertrand's physical and mental suffering before his death and apportioned liability thirty percent to Air Logistics and seventy percent to Allison.
Plaintiffs appeal the trial court's dismissal of their claims for wrongful death and loss of consortium. Air Logistics appeals the jury's assignment of thirty percent fault to it for the accident and the trial court's dismissal of its claim for property damage to the helicopter involved in the accident. Allison appeals, assigning five errors: 1) the trial court's application of general maritime law, rather than Louisiana Products Liability Law (LPLA); 2) the jury's finding of fault by Allison; 3) the amount of the jury's award for damages; 4) the admission of evidence of other accidents; and 5) the admission of exemplars of the alleged defective part.

Wrongful Death Liability
Plaintiffs' claims for wrongful death were dismissed pursuant to a motion for partial summary judgment filed by Allison. On appeal, summary judgments are reviewed de novo under the same criteria which govern a district court's consideration of the appropriateness of summary judgment. See Potter v. First Fed. Sav. & Loan Ass'n of Scotlandville, 615 So.2d 318 (La.1993). When considering motions for summary judgment, courts must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B). Summary judgment may be granted only if the mover has proved that no genuine issues of material fact exist and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966. Despite the legislative mandate now favoring summary judgments, "factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor." Willis v. Medders, 00-2507, p. 2 (La.12/8/00); 775 So.2d 1049, 1050.
Once a prima facie showing has been made that there is no genuine issue as to a material fact and that summary judgment should be granted, the burden shifts to the nonmover. La.Code Civ.P. art. 967 provides in part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
In its motion for partial summary judgment, Allison asserted that Mr. Bertrand's suicide was a superceding or intervening event for which it is not liable, and, therefore, Plaintiffs did not have a cause of action for wrongful death. There is no Louisiana law governing this issue; however, Louisiana "law presumes the love of life and negates suicide." Johnson v. National Life & Acc. Ins. Co., 331 So.2d 87, 88-9 (La.App. 1 Cir.1976). We find the presumption against suicide was overcome by the evidence surrounding Mr. Bertrand's death, specifically, a note prepared by him prior to his death which detailed the reasons *1232 for his actions and instructed his family to proceed in a certain manner.
The Restatement (Second) of Torts, § 440 defines superseding cause as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another when his antecedent negligence is a substantial factor in bringing about." Intervening force is defined as "one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." Restatement (Second) of Torts, § 441.
Suicide as an intervening cause is addressed by W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 44, at 310-11 (5th ed.1984) (emphasis added) (footnotes omitted):
Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to the contrary, it is the prevailing view that when insanity prevents one from realizing the nature of one's act or controlling one's conduct, the suicide is to be regarded as a direct result, and no intervening force at all, or else as a normal incident of the consequences inflicted, for which the defendant will be liable. The situation is the same as if one should hurt oneself during the unconsciousness or delirium brought on by the injury. But if one is sane, or if the suicide is during a lucid interval, when one is in full command of all faculties, but life has become unendurable by reason of the injury, it is agreed in negligence cases that the voluntary choice of suicide is an abnormal thing, which supersedes the defendant's liability.

Allison supported its motion with Mr. Bertrand's note, excerpts of deposition testimony of his treating psychiatrist, Dr. Kashinath G. Yadalam, and counselor, Lloyd Kelley, and the deposition testimony of his wife and daughter. Plaintiffs opposed the motion with affidavits by Dr. Yadalam and Mr. Kelley. Allison objected to the affidavits on the basis that they were untimely. The trial court allowed the affidavits to be introduced, but concluded that the assertions in the affidavits were merely conclusory restatements of legal language from cases which have addressed this issue.
Affidavits of experts which present only conclusions are insufficient to defeat summary judgment. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/00); 755 So.2d 226. The affidavit of Dr. Yadalam and Mr. Kelley are essentially identical. Each affidavit identifies the period of time during which Mr. Bertrand was under the expert's treatment and that he suffered from post-traumatic stress disorder and a mood disorder resulting from his back injury. Additionally, each affidavit contains the following identical language:
It is affiant's opinion that the injuries suffered by STEVEN BERTRAND in the helicopter accident caused STEVEN BERTRAND to commit suicide.
. . . .
To the best of affiant's knowledge, STEVEN BERTRAND never mentioned to him any plan or intent to commit suicide. It is affiant's opinion that STEVEN BERTRAND'S suicide resulted from an uncontrollable impulse to end his own life. It is further opinion that STEVEN BERTRAND'S suicide did not come at a time when he was in full command of all of his faculties, nor was his suicide a rational, deliberate choice.

Additionally, affiant has examined a copy of the note written by STEVEN BERTRAND in connection with his suicide. *1233 After evaluating the note, affiant maintains his opinion.
(Emphasis added.)
The italicized phrases of the affidavits are identical to or, almost identical to, phrases in Halko v. New Jersey Transit Rail Operations, Inc., 677 F.Supp. 135 (S.D.N.Y.1987), and Rodriguez v. Lee Marine Towing, Inc., 1996 WL 20867 (E.D.La.), aff'd, 103 F.3d 124 (5th Cir. 1996), which are discussed below. Neither affiant addressed the specifics of Mr. Bertrand's psychological status throughout his course of treatment and whether he considered him to be insane at any time. Dr. Yadalam's affidavit outlines each examination of Mr. Bertrand and states he "had no thoughts, plans or intent with regard to suicide" at those times. Mr. Kelley's affidavit indicates that Mr. Bertrand was improving and doing better than previously.
In granting partial summary judgment, the trial court made the following observations regarding Mr. Bertrand's note:
[It][i]s indicative to me of a rational deliberation about it. NotI hate to use the work "rational" because suicide never is, in my opinion. But it seems to me that every suicide victim is under some compulsion or impulse sufficient to overcome the strongest of our human instincts and that is self-preservation. And this guy overcame it.... [I]t seems to me that it wasn't in a fit of some psychotic episode or some momentary insanity. He kind of worked this thing out. And that's what the cases say create a superceding cause.
Mr. Bertrand's note reflects that he considered the impact his actions would have on his family and on himself. It is clear that this was not something he did on an impulse, as asserted in Dr. Yadalam's and Mr. Kelley's affidavits. Both of these gentlemen stated in their affidavits that Mr. Bertrand did not indicate to them that he was considering suicide. In our opinion, his note explains to some extent why he did not discuss any thoughts of suicide that he may have had: he believed that his life insurance benefits would be forfeited if he committed suicide.
In Halko, 677 F.Supp. at 142, (emphasis added), the issue of suicide as a superseding cause was addressed:
[I]f Halko's suicide was the result of mental anguish which prevented him from exercising restraint or from truly understanding his actions, it was not a superseding cause thereby breaking the causal link. However, if Halko was cognizant of the nature of his act or able to control his conduct, no liability would attach to Conrail.

In Rodriguez, 1996 WL 20867, the plaintiff opposed a motion for summary judgment regarding the defendant's liability for the decedent's suicide with an affidavit from the decedent's treating physician. After considering the affidavit, the court noted:
In drawing all reasonable inference in favor of non-movant plaintiff as required in the context of summary judgment, the Court finds that plaintiff raises a genuine issue of material fact as to whether defendant's negligence was a cause in fact of the suicide. But plaintiff's burden does not end there. Plaintiff must also raise a genuine issue of material fact as to whether defendant's negligence was the legal cause of the suicide.
Id. at p. 2.
Noting that state of mind is generally a question for the jury, the court in Rodriguez concluded that the evidence established that the decedent "made a deliberate, conscious, and pre-meditated decision to commit suicide." Id. at p. 3. The evidence in Rodriguez was stronger than it is here because the decedent's psychiatrist *1234 testified that the decedent had "planned suicide and acted deliberately." Id. However, the evidence submitted by Allison established Mr. Bertrand's state of mind prior to his death: he knew what he was doing when he committed suicide. The affidavits of Dr. Yadalam and Mr. Kelley were conclusory and insufficient to establish an issue of material fact which precludes summary judgment.
This assignment is without merit.

Loss of Consortium
Plaintiffs appeal the trial court's dismissal of their claims for loss of consortium. They rely upon the cases of Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), and American Export Lines, Inc. v. Alvez, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980). In Gaudet, the Supreme Court allowed the award of non-pecuniary damages for the wrongful death of a longshoreman in territorial waters. In Alvez, nonpecuniary damages were allowed for nonfatal injuries to a longshoreman in territorial waters. Plaintiffs' argument does not adequately address Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), in which the Supreme Court held that damages for loss of society are not recoverable in Jones Act wrongful death cases. The Court found that non-pecuniary damages are not recoverable under the Death on the High Seas Act (DOHSA), the Jones Act, or general maritime law, explaining it would be improper to award non-pecuniary damages under the general maritime law in connection with the seaman's death when such damages were prohibited by DOHSA and the Jones Act. The Court went further and emphasized the need for uniformity in maritime law, indicating that unless a statute specifically provides for non-pecuniary damages they would not be allowed for death or injuries beyond territorial waters. In doing so, the Court explicitly limited its holding in Gaudet to longshoremen in territorial waters.
Prior to Miles, the Supreme Court addressed the availability of non-pecuniary damages for deaths or injuries outside territorial waters. In Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), the Supreme Court considered whether loss of society damages were available for a wrongful death on the high seas. The Court held that such damages were not recoverable because DOHSA specifically limited recoverable damages in wrongful death suits to "pecuniary loss sustained by the persons for whose benefit the suit is brought," citing 46 U.S.C.App. § 762. Id. at 619, 2011, 98 S.Ct. 2010. Then, in Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 211, 106 S.Ct. 2485, 2488, 91 L.Ed.2d 174 (1986), the Court held that "neither OCSLA [Outer Continental Shelf Lands Act] nor DOHSA requires or permits the application of Louisiana law" to deaths beyond territorial waters.
Federal courts in Louisiana have limited the recovery of non-pecuniary damages for injuries which occur beyond territorial waters. In Robertson v. Arco Oil and Gas Co., 766 F.Supp. 535, 539 (W.D.La.), aff'd, 948 F.2d 132 (5th Cir.1991), the court held that "a dependent of a longshoreman injured on the outer continental shelf may not recover under the general maritime law applicable through 33 U.S.C. § 905(b) damages for loss of the longshoreman's consortium." Similarly, the spouse of an injured seaman does not have a cause of action for loss of society under the Jones Act or general maritime law. Murray v. Anthony J. Bertucci Constr. Co., Inc., 958 F.2d 127 (5th Cir.), cert. denied, 506 U.S. 865, 113 S.Ct. 190, 121 L.Ed.2d 134 (1992).
The district court for the Eastern District of Louisiana has held that the wife *1235 of a roustabout injured on the outer continental shelf outside Louisiana's territorial waters cannot recover damages for loss of consortium. See unpublished minute entries in Hollie v. Consolidated Natural Gas Serv. Co., Inc., No. 91-CV-608, 1993 WL 22191 (E.D.La.1993), and Boudreaux v. Penrod Drilling Corp., No. 91-CV-2660, 1992 WL 245948 (E.D.La.1992). The Fifth Circuit Court of Appeal has not specifically addressed this issue; however, it has indicated that it will not allow the recovery of loss of consortium damages for injuries beyond territorial waters. See Walker v. Braus, 995 F.2d 77 (5th Cir.1993). In Walker, the issue on appeal was whether the crew boat which collided with a fishing boat was subject to a demise charter or a bareboat charter. The court reversed the district court's finding that there was a bareboat charter and remanded the case to the district court for further proceedings. With regard to the remand, the court discussed whether loss of consortium damages would be available for the death of the fishing boat operator, stating, "[t]he Supreme Court has clearly indicated its desire to achieve uniformity of damage recoveries in the exercise of admiralty jurisdiction. Allowing Trahan [, widow of the deceased operator,] to recover loss of consortium damages would directly contradict the policy of uniformity emphasized and relied on by the Court in Miles." Id. at 82.
We find the trial court correctly dismissed Plaintiffs' claims for loss of consortium.

Air Logistic's Claim for Loss of Hull
Air Logistics assigns as error the trial court's holding that it had no claim against Allison for the loss of the hull of the helicopter in which the accident occurred. This issue presents a legal question. See Petroleum Helicopters, Inc. v. Avco Corp., 930 F.2d 389 (5th Cir.1991). Appellate review of a question of law is simply to determine whether the trial court was legally correct. Weeks v. T.L. James & Co., Inc., 626 So.2d 420 (La.App. 3 Cir.1993), writs denied, 93-2909, 93-2936 (La.1/28/94); 630 So.2d 794.
Air Logistics purchased the hull of the helicopter involved in the accident as a complete aircraft. The engine in the hull at the time of the accident was delivered to Air Logistics in July 1990 in a Bell 206L3 helicopter. In September 1997, Air Logistics removed the engine from the helicopter it was in at the time and performed maintenance work on it. The engine was reinstalled into another hull, the hull it was in when the accident occurred. This accident occurred approximately 217 hours after the engine was put back into service.
In East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865, (1986), the Supreme Court held "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." "Thus, whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss." Id. at 876, 106 S.Ct. at 2304. Pursuant to East River, the owner's remedy is the contractual warranty on the product.
In Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925 (5th Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988), a design defect in capscrews utilized within the steering mechanisms installed in vessels manufactured by the defendant caused damage to the vessels. The steering systems had been purchased, assembled, and installed in the vessels by the manufacturer. The vessels' owner sued the manufacturers of the vessels and the steering systems for the damage to the vessels. The Court *1236 upheld summary judgment in favor of the manufacturer of the vessels, finding that the individual components of the vessels did not determine what was "other property." Instead, the Court concluded that it was the object of the parties' contract or bargain that determined whether the vessels were "other property."
In Petroleum Helicopters, 930 F.2d 389, the court determined that a float manufactured by a third party, which was attached to a helicopter when purchased by the plaintiff, then switched from the original helicopter to another by the plaintiff was not "other property." In McDermott, Inc. v. Clyde Iron, 979 F.2d 1068 (5th Cir.1992), rev'd on other grounds, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994), a crane hook, purchased from a third party and assembled with a crane by the crane manufacturer, was held to be a component of the crane, not other property. Therefore, damage to the crane which resulted from an alleged defect in the hook was not recoverable from the manufacturer.
The trial court correctly determined that the object of Air Logistics' purchase from Allison was a helicopter and engine as a unit and that removal of the engine from the original hull and placement in another hull did not transform the engine into other property.
This assignment is without merit.

Louisiana Products Liability Act
Allison argues that the trial court's application of general maritime law, which utilizes the Restatement of Torts, rather than the LPLA, was error. Allison relies on Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), for its position. In Green, the supreme court applied La. Civ.Code art. 2317 to the offshore worker's claims for injuries that resulted from an accident which occurred in a helicopter crash 150 miles off the shore of Louisiana, holding that "[s]tate law and regulations may also supplement federal maritime law when `there is no conflict between the two systems of law, and the need for uniformity of decision does not bar state action.'" Id. at 637. The court further noted: "a Louisiana state court should respect Louisiana law unless there is some federal impediment to application of that law contained in federal legislation or a clearly applicable rule in the general maritime law." Id. at 638.
Allison argues there were no impediments to the application of Louisiana law in this matter; therefore, the trial court should have applied the LPLA and instructed the jury accordingly. The basis of its argument is that "[t]he utilization of the Restatement language in this case resulted in the reading of almost six legal pages of potentially confusing language, whereas the plain language of the LPLA would have properly instructed the jury." Allison does not identify any conflicts between the Restatement and the LPLA as they pertain to this case. Nor does it assert that the jury's verdict may have been different if the trial court had applied the LPLA. Accordingly, we find no error with the application of general maritime law.
This assignment is without merit.

Fault of Air Logistics and Allison
Allison and Air Logistics assign as error the jury's assessment of fault. After the trial, Allison filed a motion for judgment notwithstanding the verdict, asserting, as it does on appeal, that "there was no evidence presented by plaintiffs at trial upon which reasonable jurors could have based a finding of fault against Allison." Air Logistics also argues there was no evidence of fault on its part.
In Broussard v. Stack, 95-2508, pp. 14-15 (La.App. 1 Cir. 9/27/96); 680 So.2d 771, *1237 779-80 (citations omitted), the court considered the standards of appellate review for the grant or denial of a motion for JNOV, holding:
In ruling on a motion for judgment notwithstanding the verdict (JNOV) under LSAC.C.P. art. 1811, the trial court is required to employ the following legal standard: A JNOV should be granted only if the trial court, after considering the evidence in the light most favorable to the party opposed to the motion, finds it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on that issue. The trial judge must construe the evidence and make inferences in favor of the party opposing the motion. Additionally, in applying this standard, the court cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury. If there is substantial evidence opposed to the motion of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion must be denied. Stated more simply, a trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper.
The standard to be applied by the appellate courts in reviewing the grant or the denial of a JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous.
Due to the nature of this case, the failure of a turbine-to-compressor coupling (pea shooter) and the fact that there was no direct evidence of what caused the accident, technical evidence was required. Most of the evidence was expert testimony. Plaintiffs and Air Logistics presented the testimony of three fact witnesses and three expert witnesses on the issue of liability. Allison presented five expert witnesses.
Plaintiffs and Air Logistics presented the testimony of two metallurgical engineers who theorized that an anomaly occurred during the manufacturing process of the pea shooter, i.e., it was not baked within the proper amount of time after being nitrided, resulting in hydrogen cracking or embrittlement, which combined with high stress in the splines of the turbine area of the engine to cause the accident.
Dr. Thomas Eagar, a metallurgist whose expertise is metallurgical processing, testified that when hydrogen embrittlement is combined with tensile stress and hard steel, two factors present here, it leads to fatigue cracking when the subject part is in service. Dr. Robert Waldron, also a metallurgist who has conducted approximately 400 helicopter accident investigations, described the N1 shafting area of the engine where the pea shooter is located. According to Dr. Waldron, the N1 shafting transmits about 1200 horse power. It has three primary elements: 1) a spline adapter which connects the pea shooter to the gas producer turbine, 2) the pea shooter, and 3) a spur adapter gear shaft. He concluded that the pea shooter failed primarily due to fatigue cracks at the turbine end of the connection and that the fatigue cracks grew in such a manner that the pea shooter disengaged from the turbine section. He theorized that the engagement of the splines affected the load on the pea shooter, causing it to fail. Dr. Waldron also testified there was no indication of any misalignment of the N1 shafting when it was reassembled by Air Logistics.
*1238 Allison presented the testimony of five expert witnesses. It theorized that the N1 shafting was not reassembled properly, resulting in a misalignment that caused the pea shooter to fail. Two of its experts testified that the pea shooter did not have to meet the processing standards, specifically, baking within a specified time, as Dr. Eagar testified and that there was no hydrogen embrittlement evident on the pea shooter. Allison also presented expert testimony to show that the design of the turbine section did not result in high loads on the pea shooter, as claimed by Dr. Waldron. Air Logistics rebutted Allison's theory of improper reassembly with the testimony of the mechanic who performed the work on the turbine assembly (N1 shafting) and the mechanic who reinstalled the turbine assembly to the gearbox of the engine.
To reverse the jury's verdict, we must find from the record that a reasonable factual basis does not exist for its findings and that the findings are clearly wrong. Brandt v. Engle, 00-3416 (La.6/29/01); 791 So.2d 614.
We have reviewed the testimony of all of the witnesses and cannot say that the record does not contain a reasonable basis for the jury's determination of liability. The parties presented logical and convincing evidence regarding their competing theories of what caused the accident, including why their opponents' theory was wrong. The jury weighed the credibility of the witnesses, as well as the credibility of the competing theories, to reach its verdict. Based on the evidence presented, we find no error with the its findings of liability.
This assignment is without merit.

Exemplars
The trial court allowed Dr. Eagar to testify regarding exemplars of the pea shooter that were provided to him by Air Logistics. Some of the exemplars had been discarded and were retrieved from the garbage. Allison asserts that admission of this evidence was "significantly more prejudicial than probative," arguing the exemplars may have been damaged when discarded. Dr. Eagar testified that because the coating on the exemplars, which is very hard, was not damaged when he received them, he did not believe any of them were damaged.
The trial court is vested with vast discretion in connection with the admissibility of evidence. It will not be reversed absent an abuse of that discretion. Maddox v. Omni Drilling Corp., 96-1673 (La.App. 3 Cir. 8/6/97); 698 So.2d 1022, writs denied, 97-2766, 97-2767 (La.1/30/98); 709 So.2d 706. Allison did not establish that any of the exemplars were damaged or how admission of the exemplars was prejudicial. We find no abuse by the trial court in admitting the exemplars.
This assignment is without merit.

Other Accidents
Allison assigns as error the trial court's admission of evidence regarding three prior accidents which occurred in flight and involved the same model pea shooter.
The general rule with regard to the admissibility of evidence of prior accidents is that it is admissible for the limited purpose of showing that the defendant had notice of defects or physical conditions which are dangerous. Burk v. Illinois Central Gulf R.R. Co., 529 So.2d 515 (La.App. 1st Cir.1988). Nevertheless, the party seeking to introduce evidence of prior accidents must show that the prior accidents involve substantially the same circumstances or conditions which caused the accident at issue. Id.

*1239 Hasha v. Calcasieu Parish Police Jury, 94-705, p. 11 (La.App. 3 Cir. 2/15/95); 651 So.2d 865, 874, writs denied, 95-667, 95-676 (La.4/28/95); 653 So.2d 592, 593.
The trial court heard Allison's motion to exclude this evidence during the course of the trial. Its decision to allow the evidence was based upon the testimony of Dr. Eagar. After much discussion regarding the other accidents and whether they were substantially similar to this accident, Dr. Eagar testified:
The cracking appears substantially similar, both in the fracture features in the microscope and the orientation down the splines. They have the same types of cracks, partial cracks at the spline roots.... So from a metallurgical ... not from looking at all the other evidence about the maintenance and everything else. But just looking at the metallurgical part, I can't distinguish them from the incident one.
According to Dr. Eagar's testimony, the other accidents were substantially similar metallurgicallyhe could not distinguish them from each other. We find no error with the trial court's admission of this evidence.

Damages
Allison complains that the jury's award of $400,000.00 for Mr. Bertrand's physical and mental pain and suffering prior to his death was excessive, arguing the award reflects that the jury essentially made an award for his wrongful death. We do not agree.
This accident occurred when the engine of the helicopter in which Mr. Bertrand was a passenger failed. The helicopter went from an altitude of approximately 900 feet into the Gulf of Mexico where the seas were eight to ten feet high. Mr. Bertrand suffered an injury to his back while escaping from the downed helicopter. In April 1999, he underwent a lumbar diskectomy at the L4-5 level in his back. While the evidence reflects that Mr. Bertrand's recovery from his back injury progressed well and that he had been released to return to work shortly before his death, it also reflects that he endured significant mental suffering. As previously discussed, he was treated by a psychiatrist and a mental health counselor from shortly after his accident until the time of his death for post-traumatic stress disorder and major depression. His deposition testimony and his suicide note reveal that his mental suffering was great. In his deposition, he testified that he had recurring nightmares of the accident; however, his nightmares were worse than the accident had been. In his suicide note, he stated that hearing or talking about a helicopter scared him. His mental suffering was clearly a factor in his taking his life.
The jury has vast discretion in awarding general damages and appellate courts should rarely disturb such awards on appeal. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv., Inc., 99-934 (La.10/29/99); 747 So.2d 1085; Reck v. Stevens, 373 So.2d 498 (La.1979). We find no abuse.
This assignment is without merit.

DECREE
The judgment of the trial court is affirmed. Costs are assessed to Allison and Air Logistics seventy and thirty percent, respectively.
AFFIRMED.